Gertrude **VIRTS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 1169–84.

Court of Criminal Appeals of Texas, En Banc.

Oct. 21, 1987.

James R. Lawrence, Corpus Christi, for appellant.

Grant Jones, Dist. Atty., Jack E. Hunter, Charles Vanaman and Jeffery A. Babcock, Asst. Dist. Attys., Corpus Christi, Robert Huttash, State's Atty., Austin, for State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

TEAGUE, Judge.

Gertrude Virts, hereinafter appellant, was found guilty by the jury of capital murder, "We, the jury, find the Defendant,

Gertrude Virts, guilty of the offense of Capital Murder, under the facts alleged in paragraphs 9 and 10 [of the trial court's charge to the jury]." Because of their importance to our decision to reverse the judgment of the court of appeals, we will attach to our opinion as "Appendix A" paragraphs 9 and 10, as well as paragraph 11, of the charge. Because the jury did not answer all of the special issues in the affirmative, the trial judge assessed appellant's punishment at life imprisonment. See Art. 37.071, V.A.C.C.P.

■ We granted appellant's petition for discretionary review in order to determine whether on direct appeal the Corpus Christi Court of Appeals, in its unpublished opinion, see *Virts v. State*, No. 13–82–357–CR, December 29, 1983, correctly rejected the following claims that appellant asserted, that "The trial court erred in not allowing [her] to properly cross-examine the codefendant [Cynthia May, hereinafter Cindy], a State's witness, as to her mental state" and that "The trial court erred in not allowing [her] to cross-examine the State's witness [Cindy], as to a pre-trial agreement concerning her testimony against Appellant."[1]

Finding that the court of appeals incorrectly resolved these contentions against appellant, we will reverse its judgment and remand the cause to the trial court.

The record reflects that Cindy, appellant's co-defendant, testified against appellant pursuant to a plea bargain agreement that she had made with the prosecution pretrial. Because of its importance to our decision, we will attach the plea bargain agreement to this opinion as "Appendix B".

■ Cindy testified that she, appellant, and another person, Paul Kuck, hereinafter Kuck, entered into a conspiracy to rob Tammy Lee, hereinafter Lee, and in carrying out the conspiracy she shot Lee

and participated in the murders of Yong Chi Clark, hereinafter Clark, and Pong Yong Forsgren, hereinafter Forsgren.

We pause to point out that, given her testimony, Cindy became an accomplice witness as a matter of law, and the jury was so instructed. This Court has held that because such a witness is usually deemed to be corrupt, the witness's testimony should always be looked upon with suspicion. See *Holladay v. State*, 709 S.W.2d 194 (Tex.Cr.App.1986). Thus, any available relevant adverse evidence that might affect such a witness's credibility should be admitted so that the jury might use it in making the determination of how much weight it should give the witness's testimony. See *Bates v. State*, 587 S.W.2d 121 (Tex.Cr.App.1979).

Appellant testified on her own behalf. She denied entering into a conspiracy with Cindy and Kuck to rob Lee. Appellant testified that she, Cindy, and Kuck entered into a conspiracy only to burglarize a "massage" parlor type establishment, hereinafter the Osaka, in order to steal a large sum of money that was believed to exist inside of the Osaka. Appellant testified that she went inside the Osaka only because she did not believe that anyone would then be present. Appellant further testified that she was unarmed at this time and was unaware that Cindy was then armed with a pistol and a set of nunchuks. Appellant testified that after she and Cindy gained unlawful entry into the Osaka, she and Cindy were thereafter confronted by Clark, who was soon shot by Cindy. Cindy also testified that she thereafter shot Lee and Forsgren, after which, while she held them individually, Kuck cut the throats of Clark, Lee, and Forsgren. Lee was the only one of the three who survived.

Lee also testified against appellant but she did not testify that appellant participated in any of the violent acts that were

---

1. Because we now find that we are in agreement with the court of appeals' decision to overrule appellant's contention, that "The trial court erred in not allowing Appellant to present the testimony of Dr. Feltoon to the jury concerning the mental state of the witness Cynthia May [Cindy]", which was done on the basis of what

this Court stated and held in *Hopkins v. State*, 480 S.W.2d 212 (Tex.Cr.App.1972), even though review was also granted on this point, we will not address it. Also see *Beavers v. State*, 634 S.W.2d 893, 898 (Tex.App.—1st 1982, P.D.R. refused).

committed inside of the Osaka, nor, because she was unaware of any of the above conspiracies, did she testify to any aspects of these conspiracies.

Appellant further testified that everything that she did inside of the Osaka, which mainly consisted of looking for the money that was believed to exist inside of the Osaka, was done on the orders of Cindy. She testified that she carried out these orders only because she feared that if she did not do so Cindy would have shot her, as she did Clark, Lee, and Forsgren. Appellant denied that she had anything to do with the shootings and the murders that were committed inside of the Osaka.

Given the above, together with the jury instructions that were contained in paragraphs 9, 10, and 11, we find that it should be obvious to almost anyone that in order for the jury to have found appellant guilty as it did, it had to disbelieve appellant's testimony and believe Cindy's testimony beyond a reasonable doubt.[2]

When Cindy testified, appellant made it known to the trial judge that she wanted to cross-examine Cindy about her past and current mental illness that she suffered, and her treatment for those problems. She was prevented from doing so because the trial judge granted the State's motion in limine. As easily seen by the excerpts from the record that we attach to this opinion as "Appendix C", the trial judge, even for purposes of appellant developing her informal bill of exception, was not going to let appellant broach the subject of Cindy's recent mental illness and treatment in the presence of the jury, and he didn't.

After the trial judge granted the State's motion in limine, appellant attempted to have placed into the record through an informal bill of exception, among other subjects, the following: That Cindy had committed herself in 1979, (the offense occurred on September 12, 1981), to a hospital for mental problems that she was then undergoing, and remained there for ap-

proximately six weeks, during which time she was treated by three psychiatrists or psychologists, after which she received outpatient treatment for approximately eight months. After charges were filed against her, pursuant to court order, Cindy was also examined by three psychiatrists or psychologists and spent at least a week in a mental hospital. Also see "Appendix C".

In rejecting appellant's contention, that "The trial court erred in not allowing Appellant to properly cross-examine the code-fendant [Cindy] as to her mental health", the court of appeals held that appellant failed to establish in the record that any omitted testimony of Cindy would have shown that Cindy harbored ill-feelings toward or bias against appellant. We find that in rejecting appellant's contention the court of appeals might have viewed the record too narrowly and the law on perfecting error for review too strictly.

■ In deciding whether evidence going to the fact that a witness has suffered in the recent past, before the event in question occurred, a mental illness or mental disturbance is admissible evidence, given the imponderables of mental illness and mental disturbances, such decision must, of course, be decided on an ad hoc basis, and with great deference being given the trial judge initially deciding whether that evidence should be admitted for the jury's consideration. The right of cross-examination, while constitutionally secured, is not without limits. The trial judge retains wide latitude to impose reasonable limits on cross-examination based upon concerns about, among other things, harassment, prejudice, confusion of issues, and the witness's safety. See, for example, *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The record does not reflect or indicate that any of these factors are present in resolving the issue.

■ Given the jury instructions regarding paragraphs 9, 10, and 11 of the charge,

---

**2.** This Court presumes that a jury verdict is based upon the instructions given by the trial judge. See *O'Pry v. State,* 642 S.W.2d 748 (Tex. Cr.App.1982) (Opinion on rehearing); *Benson v.*

*State,* 661 S.W.2d 708 (Tex.Cr.App.1982); *Ortega v. State,* 668 S.W.2d 701 (Tex.Cr.App.1984); and *Boozer v. State,* 717 S.W.2d 608 (Tex.Cr.App. 1986).

and the evidence, Cindy was undoubtedly the single most important witness who testified for the State. Thus, within reason, the jury should have had the benefit of any relevant evidence that might have affected her credibility as a witness.

 In *Koehler v. State*, 679 S.W.2d 6 (Tex.Cr.App.1984), this Court pointed out that for appellate review purposes, concerning excluded evidence, there is a distinction between the situation where the defendant desires to elicit certain, specific responses from a State's witness but is precluded from doing so by the trial judge, and the situation where the defendant is not permitted to question a State's witness about a certain general subject that might affect the witness's credibility. In the former situation, to preserve error for appellate review, the defendant is required either to have the witness testify and answer the specific questions he desires the witness to answer in the presence of the jury or the defendant must make an offer of proof of the questions he would have asked and the answers he expected to receive had he been permitted to question the witness in the presence of the jury. See *Koehler*, supra, at page 9, and the cases cited therein. However, in the latter situation, when the issue before the appellate court, as it is here, is whether counsel for appellant was denied the opportunity to question the testifying State's witness Cindy in the presence of the jury generally about what might have affected her credibility, to preserve the error, the defendant need not show what his cross-examination of the witness would have affirmatively established; he must merely establish what general subject matter he desired to examine the witness about during his cross-examination and, if challenged, show on the record why such should be admitted into evidence. *Koehler*, supra, at page 9; *Harris v. State*, 642 S.W.2d 471, 479 (Tex.Cr.App.1982). Also see former Art. 40.09, subd. 6(d)(1), 1965 Code of Criminal Procedure, and Rule 52(b), *Tex.Rules of Appellate Procedure*.

We find that appellant made an offer of proof when her attorney stated, inter alia, "It's our contention that [Cindy's] psychiatric problems are affecting her ability to testify and in, first of all, a truthful manner; second of all, it affects her ability—her mental state and her past psychiatric state and present psychiatric state have affected her ability to observe at the time of the Osaka incident, to remember what occurred, and to state it truthfully to the jurors here." Also see and compare what occurred in *Koehler*, supra.

We find and hold that appellant preserved her error going to the excluded testimony of Cindy's mental illness for appellate review and the court of appeals erred in holding that the error had not been perfected.

Because this Court has often stated and discussed the fact that one of the greatest constitutional rights that an accused person might have is the right to confront and cross-examine the State's witnesses, to repeat here what has already been sufficiently stated in the past would merely unnecessarily elongate this opinion. For this Court's latest expression on these subjects, see *Long v. State*, 742 S.W.2d 302 (Tex.Cr.App.1987, pending on rehearing at this time).

 Notwithstanding what we have just stated, we believe that it is still necessary to point out, for emphasis purposes, that the right of cross-examination by the accused of a testifying State's witness includes the right to impeach the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to any impairment or disability affecting the witness's credibility. Also see the cases collected in footnotes 88, 89, and 90 in Black's article "The Texas Rules of Evidence—A Proposed Codification", 31–2 *Southwestern Law Journal* at 986.

Of course, within reason, the trial judge should always allow the accused great latitude to show any relevant fact that might tend to affect the witness's credibility. See *Koehler v. State*, 679 S.W.2d 6, 9 (Tex.Cr.App.1984); *Harris v. State*, 642 S.W.2d 471 (Tex.Cr.App.1982); *Carillo v. State*, 591 S.W.2d 876, 885–886 (Tex.Cr.App.1979).

Cross-examination of a testifying State's witness to show that the witness has suffered a recent mental illness or disturbance is proper, provided that such mental illness or disturbance is such that it might tend to reflect upon the witness's credibility. See *Bouldin v. State*, 87 Tex. Cr.R. 419, 222 S.W. 555 (Tex.Cr.App.1920). However, simply because the term "mental illness" is "relative in force, there being a wide range of severity," from mere "nervousness and the mild transient situational personality disorder, through the psycho neuroses, to the thoroughly delibitating psychoses," Brussel and Cantzlaar, *The Layman's Dictionary of Psychiatry* (1967 edition), the mere fact that the State's testifying witness has in the recent past suffered or received treatment for a mental illness or disturbance does not, for this reason alone, cause this kind of evidence to become admissible impeachment evidence. If the witness is shown to have been suffering from a recent mental illness, prior to the occurrence of the event in question, and such might be considered a "persistent disabling disturbance of his mental and/or emotional equilibrium, manifested through persistent maladjustment and more or less irrational, even bizarre behavior and speech," Brussel and Cantzlar, supra, whether psychic or organic in origin, then, of course, the trial judge should permit the jury to hear this kind of evidence. On the other hand, if the witness's mental illness or mental disturbance occurred in the remote past, and there is no showing that such has revived, the fact that the witness has suffered in the remote past a mental illness or mental disturbance should not be admitted into evidence because such would probably be totally irrelevant and immaterial to the defendant's trial.

As noted by the court of appeals, Cindy's testimony, as reflected in the informal bill of exception, indicated that she had committed herself in 1979 for psychiatric problems she had sustained in Indiana for which she was hospitalized from four to six weeks, after which she continued receiving treatment as an outpatient for eight months. Although appellant's counsel was not permitted to question Cindy about a potential suicide attempt that occurred while she was in jail in another city as a result of charges filed against her for allegedly committing the offenses that occurred inside of the Osaka, we find that counsel sufficiently demonstrated that Cindy's mental problems were still ongoing. The record further reflects that pursuant to court order, after Cindy had been charged with committing the offenses that occurred inside of the Osaka, she was seen by three psychiatrists or psychologists and spent at least a week in a mental hospital.

We find that the above proffered evidence should have been admitted into evidence for the jury's consideration because it might have aided the jury in deciding whether to believe Cindy. We hold that any objection that might have gone to the general subject of Cindy's mental impairment as a witness would have gone to the weight of her testimony and not its admissibility. We need not decide today to what degree appellant should have been permitted to cross-examine Cindy about her mental problems. We are only holding today that appellant should have been permitted to at least broach the subject of Cindy's recent mental problems, that she might have had prior to and after the events that occurred inside of the Osaka, in the presence of the jury.

We also find that the trial judge erred when he refused to let appellant, during her cross-examination of Cindy, examine Cindy about *all* of the pretrial plea bargaining agreement that she and the prosecution had entered into pretrial. A copy of this agreement is attached to this opinion as "Appendix B".

The record reflects that the trial judge refused to permit appellant to cross-examine Cindy about that part of the plea bargain agreement that related to the fact that when Cindy was going to plead guilty and be sentenced the State would recommend to the trial judge that he not put in the judgment a "deadly weapon" affirmative finding and also refused to permit appellant to cross-examine Cindy about that part of the plea bargain agreement which

provided that her punishment would not exceed the severest punishment assessed Kuck or appellant.

On direct appeal, the court of appeals rejected appellant's claim that the trial judge erred by excluding this evidence from the jury, holding that, as to the affirmative finding, this "would not have shown any bias against appellant if presented before the jury", and, as to maximum punishment that Cindy would receive, and the possibility that she stood to automatically gain a lesser punishment, that this information would actually "show a motive for [Cindy] testifying as mildly as possible to insure the shortest sentence for appellant," (Page 13 of slip opinion), apparently concluding as to the latter that, if the trial judge erred, the error was harmless beyond a reasonable doubt.

As previously pointed out, given the jury's reason why it found appellant guilty, Cindy was not only an accomplice witness as a matter of law, but, without a doubt, was also the State's "star" witness.

In *Blair v. State*, 511 S.W.2d 277, 279 (Tex.Cr.App.1974), this Court approved the following principle: "The motives which operate upon the mind of a witness when he testifies [for the State] are never regarded as immaterial or collateral matters." In *Holladay v. State*, supra, this Court pointed out that "By the very definition of the word 'accomplice', such a person who testifies for the prosecution is infamous and his testimony is considered so untrustworthy a conviction should not be based solely upon that testimony. Because such a witness is usually deemed to be corrupt, his testimony is always looked upon with suspicion."

 Thus, *any* relevant testimony, that might aid the jury in deciding the credibility of such a witness should usually be admitted into evidence unless the opposing party can give valid legal reasons why it should not be admitted into evidence. *Bates v. State*, supra. The State in this instance has never given any valid legal reasons why the excluded evidence was not legally admissible evidence.

 Where an accomplice witness, who has pending criminal charges, has entered into a plea bargain agreement with the prosecution pretrial, and later testifies for the State, as occurred here, and the defendant wishes to introduce all of the plea bargain agreement into evidence, in order to show bias, prejudice, motive, etc., of the witness, the total agreement should be admitted into evidence. See *Bates v. State*, supra.

In this instance, excluded from the jury was that part of the plea bargain agreement which provided that when Cindy was going to plead guilty and be sentenced on the outstanding charges then pending against her the State would not seek to have the trial judge enter an affirmative finding in the judgment that Cindy either used or exhibited a deadly weapon.

We find that this information was clearly relevant because such could affect when Cindy became eligible for parole. See Art. 42.12, now § 3g(a)(1)(A), V.A.C.C.P., and Art. 42.18, § 8(a), V.A.C.C.P.[3]

The trial judge clearly erred in excluding this evidence from the jury. As to how much weight the jury might have given this information, we, of course, cannot say. We are only holding that the jury should have received this information.

As to the excluded testimony that went to that part of the plea bargain agreement that provided that in no event would Cindy's punishment exceed 50 years' confinement in the Department of Corrections, and could in fact be less if either appellant or Kuck received a lesser punishment, we cannot disagree with the logic of the court of appeals that this would have been a motive for Cindy testifying "as mildly as possible" against appellant. Notwithstanding our agreement, we are unable to conclude that the jury would have so viewed this evi-

**3.** Under the law that governs a prisoner's eligibility for parole, if the judgment contains an affirmative finding that the prisoner used or exhibited a deadly weapon in the commission of the offense for which he has been convicted, then the prisoner is not eligible for release on parole until his actual calendar time served, without consideration of good conduct time, equals one-third of the maximum sentence or 20 calendar years, whichever is less.

dence, which was a decision that the jury had to make and not for any appellate court to make.

The trial judge clearly erred by not permitting appellant to cross examine Cindy about all aspects of the plea bargain agreement she had made with the prosecution, and the court of appeals also clearly erred in sustaining the trial judge on this point. Also see *North Carolina v. Castleberry*, 73 N.C.App. 420, 326 S.E.2d 312 (1985), *People v. Hinchman*, 40 Colo.App. 9, 574 P.2d 866 (1977), *Long v. State*, supra, *Carmona v. State*, 698 S.W.2d 100 (Tex.Cr. App.1985), and Schwartz, 2 *Proof, Persuasion and Cross-Examination: A Winning New Approach in the Courtroom* § 16.14 and § 16.15.

For the above and foregoing reasons, the judgment of the court of appeals is reversed and the cause is remanded to the trial court.

ONION, P.J., and W.C. DAVIS, McCORMICK, CAMPBELL, WHITE and DUNCAN, JJ., concur in the result.

### APPENDIX A

#### 9.

Now, if you find from the evidence beyond a reasonable doubt that Gertrude Virts, Cynthia May, and Paul Kuck entered into a conspiracy to rob Tammy Lee and that pursuant thereto they did carry out or attempt to carry out such conspiracy to rob Tammy Lee in that on or about the 12th day of September, 1981 in Nueces County, Texas while in the course of committing theft of property from Tammy Lee, to wit, money, and with intent to obtain or maintain control of said property, Paul Kuck, Cynthia May, or both intentionally caused the death of Yong Chi Clark by shooting her with a gun or cutting her throat with a knife intending thereby to kill the said Yong Chi Clark and that the killing of Yong Chi Clark was in furtherance of the robbery of Tammy Lee, if any, and that the murder of Yong Chi Clark, if any, was an offense that should have been anticipated as a result of the carrying out of the

conspiracy, then you will find the Defendant, Gertrude Virts, guilty of Capital Murder.

#### 10.

You are further instructed that before Gertrude Virts can be convicted of Capital Murder, under the facts alleged in paragraph 9., you must find that an offense of Murder was committed upon the person of Yong Chi Clark; and that the murder of Yong Chi Clark was committed by Cynthia May or Paul Kuck, or both, by shooting Yong Chi Clark with a gun or cutting Yong Chi Clark with a knife; and that the offense of murder was committed in furtherance of an unlawful purpose; and that the unlawful purpose was the commission of a robbery of Tammy Lee; and that the offense of Murder of Yong Chi Clark was one that Gertrude Virts should have anticipated as a result of the carrying out of the conspiracy to commit the robbery of Tammy Lee. If you do not believe that each of the preceeding elements existed or if you have a reasonable doubt thereof, you will find the Defendant not guilty of Capital Murder as alleged under the facts of paragraphs 9 and 10.

#### 11.

You are further instructed that in order to find the Defendant, Gertrude Virts, guilty of Capital Murder, under the facts alleged in paragraphs 9 and 10 you must find beyond a reasonable doubt that Gertrude Virts, Paul Kuck, and Cynthia May entered into a conspiracy to rob or attempt to rob Tammy Lee and you must find beyond a reasonable doubt that the murder of Yong Chi Clark was committed in furtherance of the conspiracy to rob or attempt to rob Tammy Lee and you must find beyond a reasonable doubt that the murder of Yong Chi Clark was an offense that should have been anticipated as a result of the carrying out of the conspiracy, if any. If you do not so find or if you have a reasonable doubt thereof you must find the Defendant not guilty of Capital Murder as alleged under the facts of paragraphs 9 and 10.

APPENDIX B

No. 82–CR–23C

No. 82–CR–24C

No. 82–CR–39C

In the District Court 94th Judicial District Nueces County, Texas

The State of Texas

vs.

Cynthia May

## PRETRIAL AGREEMENT

IT IS HEREBY AGREED between the Nueces County District Attorney's Office, the Defendant Cynthia May, and the Defendant's Attorneys Patrick J. McGuire and Jose Longoria, that the following conditions form the basis for cooperation by Cynthia May in the prosecution of Paul Kuck and Gertrude Virts for the charges of capital murder and attempted capital murder arising out of the same incidents for which Cynthia May stands indicted in the above-referenced causes:

1) IT IS AGREED that in return for the Defendant Cynthia May's plea of guilty in the above three (3) causes and cooperation in the prosecution of Paul Kuck and Gertrude Virts, the District Attorney's Office of Nueces County, Texas will reduce the two Capital Murder charges to Murder and will recommend punishment not to exceed fifty (50) years confinement in the Texas Department of Corrections in all three (3) of the above causes, said sentences to run concurrently. IT IS FURTHER AGREED that in no event will the punishment recommended by the District Attorney's Office for Cynthia May exceed the severest punishment assessed against either Paul Kuck or Gertrude Virts.

2) IT IS AGREED that in return for Defendant Cynthia May's plea of guilty in the above three (3) causes and cooperation in the prosecution of Paul Kuck and Cynthia May, the District Attorney's Office of Nueces County will make the above recommendations even if the prosecution should elect not to call Cynthia May to the stand to testify in the trial of Paul Kuck or Gertrude Virts so long as Cynthia May remains willing to testify if called. The Defendant Cynthia May specifically agrees to testify against Paul Kurk and/or Gertrude Virts on as many occasions as the State may require and deem necessary; this agreement does not expire upon the passage of a particular period of time, but rather shall continue until such time as the State indicates the testimony of Cynthia May is no longer required.

3) IT IS AGREED that should the plea negotiations between the Nueces County District Attorney's Office and the Defendant Cynthia May for any reason fail to result in a guilty plea, the Nueces County District Attorney's Office will not attempt to introduce into evidence at any subsequent trial of the Defendant Cynthia May any admissions or fruits of admissions by Cynthia May made to the Nueces County District Attorney's Office or its representatives on or after the date hereof.

4) IT IS AGREED that as a term of this pretrial agreement the Defendant, Cynthia May, will withdraw any and all pre-trial motions filed in the above cause numbers, or in preceding cause numbers regarding the same offense, and further specifically waive her right of appeal in the above cause numbers, any preceding cause numbers regarding the same offenses, and in the event of reindictment or the filing of a subsequent information in lieu of indictment, any subsequent cause numbers regarding the same offense. Such withdrawal shall be made after the acceptance of her plea of guilty and sentencing in conformity with this agreement.

5) IT IS AGREED that the State will not seek an affirmative finding that the Defendant used or exhibited a deadly weapon during the commission of the offenses or during immediate flight therefrom. The State shall satisfy this term of the Pretrial Agreement by refraining from advocating such a finding and by refraining from pleading and proving that the Defendant used or exhibited a deadly weapon during the commission of the offenses or during immediate flight therefrom.

6) IT IS AGREED that the State, to insure the personal safety of the Defendant, Cynthia May, shall in good faith seek to insure that the Defendant is at no time confined with either Gertrude Virts or Paul Kuck. However, the State shall satisfy this term of the Pretrial Agreement simply by attempting in good faith to insure that appropriate officials within the Texas Department of Corrections and Nueces County Sheriff's Office are contacted and made aware of the strong desire of the Nueces County District Attorney's Office that the Defendant be at all times segregated from Gertrude Virts and Pual Kuck, to insure the personal safety of the Defendant. So long as the State makes such good faith communication of its desire and the reasons therefore, the actual location of the Defendant during her term of imprisonment shall have no effect on the validity of this Agreement.

SIGNED this ____ day of ____, 1982.

/s/ Cynthia May
CYNTHIA MAY, DEFENDANT

/s/ Patrick J. McGuire
PATRICK J. McGUIRE
STATE BAR NO. 13664500
ATTORNEY FOR DEFENDANT

/s/ Jose Longoria
JOSE LONGORIA
BAR NO. 12544850
ATTORNEY FOR DEFENDANT

/s/ Jack E. Hunter
JACK E. HUNTER
BAR NO. 10300500
FIRST ASSISTANT DISTRICT ATTORNEY

/s/ Aubrey R. Williams
AUBREY R. WILLIAMS
BAR NO. 21512500
ASSISTANT DISTRICT ATTORNEY

APPENDIX C

Q. Miss May, what precipitated or necessitated your being hospitalized?

MR. MAGUIRE: Your Honor, may I have just a moment with my client?

THE COURT: Yes, sir.

MR. MAGUIRE: Your Honor, if it please the Court, I am advising my client not to answer that question on the ground it may tend to incriminate her and also on the grounds of privacy to which she is entitled in her doctor-patient relationship.

THE COURT: All right, sir.

Q. Miss May, how long did you remain in the hospital?

A. Oh, four, six weeks.

Q. Was it about six weeks or four weeks—you're just not sure?

A. I can't say.

Q. Did you undergo outpatient treatment after you were released from the hospital?

A. Yes, I did.

Q. For how long?

A. Until I quit.

Q. How long was that?

A. I couldn't say.

Q. Was it a period of months, weeks, years, what?

A. Months.

Q. Were you ever released or did you quit, as you said?

A. What do you mean released?

Q. Well, did your doctor ever say that you were released, that you didn't have any more problems and that you didn't have to come back again?

MR. MAGUIRE: Your Honor, I'm going to—I'm kind of in a strange position. I'm not sure whether I have any standing to object, but it seems to me that we're getting into the domain of her personal medical history to which she has a right to privacy, and I can't imagine what conceivable relationship something that happened in 1979 could have to her credibility or this case.

THE COURT: Sustained.

MS. HAAS: Well, Your Honor, of course we'll object to the sustaining of that objection simply because we're being denied any ability to find out what her medical background is. It's our contention that her psychiatric problems are affecting her ability to testify and in, first of all, a truthful manner; second of

all, it affects her ability—her mental state and her past psychiatric state and present psychiatric state have affected her ability to observe at the time of the Osaka incident, to remember what occurred, and to state it truthfully to the jurors here; and we must object to not being allowed to make our Bill in an appropriate, complete manner.

THE COURT: Yes, ma'am. Overruled.

MR. VANAMAN: For purposes of the record, the State will take up Mr. Maguire's position and object on that basis just for purposes of the record.

THE COURT: All right, sir.

MR. MAGUIRE: Can I ask the Court whose objection is overruled?

THE COURT: Ms. Haas'.

Q. (By Ms. Haas) Miss May, when did you quit going to see the doctor; how long was it?

A. I thought I had already answered that.

Q. Give us an idea, two months, three months, four months, six months, what?

A. Eight months.

Q. Were you ordered to the hospital under Court Order?

A. No, I went on my own self. I committed myself.

Q. Have you been to see another psychiatrist since then or psychologist?

A. Yes, I have.

Q. Who is that person?

A. Feltoon, Kutnick.

Q. And more recently, Dr. Larry Taylor over at Memorial Hospital?

A. Yes, ma'am.

Q. These last three were under Court Order, correct?

A. Yes, ma'am, they were pertaining to this case, I believe.

Q. Prior to this time you have entered into the Court's records a notice to the Court that you will plead—that you were insane at the time of the event, is that correct?

A. Now come back?

Q. Have you entered motions into the record of this Court—have you filed motions stating that you will claim that you were insane at the time of the Osaka incident asking for these doctors to be appointed or, at least, asking for Dr. Feltoon to be appointed?

MR. MAGUIRE: Your Honor, if I can interject here, I, at the very initial phases of this trial, filed a request for a psychiatric examination which includes a notice of intent which is required by law to be given. I don't think that Miss May has ever seen that particular piece of paper.

THE COURT: All right, for the record will you identify yourself, sir?

MR. MAGUIRE: Pat Maguire, Miss May's attorney.

THE COURT: All right, sir.

Q. (By Ms. Haas) After your stay in the Wabash Valley Mental Health Center, have you had occasion to be in any other hospital for mental health reasons?

A. No, ma'am.

Q. Of course, about two weeks ago you spent approximately a week in Memorial Hospital on the seventh floor, correct, but that was by Court Order?

A. Yes, ma'am.

Q. Did you yourself ask to be placed there?

A. No, ma'am.

Q. Miss May, when you were picked up on these charges, you spent sometime in the jail up in North Texas, correct?

A. Some time, two days, yes, ma'am.

Q. And while you were there did you cut your wrist?

MR. MAGUIRE: Your Honor, I'm going to again object to that. I don't see what the relevancy is to this particular proceeding, and I don't think that all of this should be dragged out in front of the press if it's not relevant.

THE COURT: Sustained.

MS. HAAS: Your Honor, of course, we object to the sustaining of that particular—

THE COURT: That will be overruled, too.

MS. HAAS: May I state my grounds?

THE COURT: Oh, I thought you were making an objection to the Court sustaining the objection. I say overruled, too.

MS. HAAS: Well, yes, but may I state my grounds for my objection?

THE COURT: There is no need.

MS. HAAS: Well, does that mean the Court is denying my ability to object on any grounds that I might state?

THE COURT: No, ma'am, just on the grounds that he announced to the Court.

MS. HAAS: Is the Court denying my right to object on any grounds period, so that my record can be complete that I offered to make an appropriate objection, but the Court is denying my ability to do so?

THE COURT: I'm not denying you anything, Ms. Haas.

MS. HAAS: Well then, may I state my grounds for an objection?

THE COURT: Well, do you have an objection to make?

MS. HAAS: Yes, Your Honor.

THE COURT: Go ahead and make your objection.

MS. HAAS: My objection is, first of all, that we're on a Bill at this time as well as making our offer of evidence.

THE COURT: You're objecting to being on a Bill?

MS. HAAS: No, Your Honor.

THE COURT: Oh, okay.

MS. HAAS: My objection is that at this time we're on such a Bill and we're making such a Bill. We have a right to make a Bill and to proffer evidence to the Court in that Bill so that the Court of Appeals can read a full and complete record. It is our understanding, first of all, that it is not by any means private knowledge that these things occurred up in the cell, and I believe it was Dangerfield—I can't remember the name of the time—but it has been written in the newspaper. It has also been written in the various offense reports that have been handed to us.

THE COURT: What has been written, Ms. Haas?

MS. HAAS: That she attempted to commit suicide or cut her wrist. It may have been that she just cut her wrist and didn't really attempt to commit suicide. Whatever it is, the fact that she took a light globe, busted it, and cut her wrist is of public record now and has been for months. It was testified to in open court here earlier in pre-trials, so we can see no way that this is invading her right to privacy. It is very germane to whether or not this woman has the capacity to testify, the capacity to remember, the capacity to speak truthfully, the capacity to have seen what was occurring in a clear and appropriate light at the Osaka. For all those reasons, we want to offer it in our Bill so that the Court of Appeals can see a true picture of her mental state, present and past. For that reason, we object to being denied such testimony.

THE COURT: Ask the question so that I know where I am. Ask the question of the witness.

MS. HAAS: Okay, the question is: Miss May, did you cut your wrist while you were in jail in Dangerfield, Texas?

MR. MAGUIRE: And we object to that question on the basis of the Fifth Amendment and on the basis of her right to privacy.

THE COURT: I sustain the objection.

MS. HAAS: And, of course, is the Court overruling our objection so that the record will be absolutely clear that we're objecting to the Court sustaining his objection. I need to have an overruling so that my record will be absolutely clear.

THE COURT: Okay, let me explain to you what the Court is doing. I don't know how you're receiving it, but what I'm saying is that the question about cutting her wrist—I'm sustaining the objection to that. That's what I'm doing, Ms. Haas.

MS. HAAS: And you are at this point not allowing us to ask her that question and put that evidence down on our Bill?

THE COURT: I'll allow you to ask the question. I'm sustaining the objection

on the Fifth Amendment and that it is irrelevant. That's what I'm sustaining the objection to.

MS. HAAS: Well then, I assume the Court is overruling my objection to the Court's ruling?

THE COURT: If that is the effect, that is what it is.

MR. MEDINA: Note our exception.

THE COURT: Yes, sir.

Q. (By Ms. Haas) Did you, when you arrived at the Nueces County Jail, two times attempt to cut your wrist?

MR. MAGUIRE: Objection on the same grounds, Your Honor.

THE COURT: Sustained.