# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-00-00307-CR

**Gregori Patrick Pierce, Appellant**

**v.**

**State of Texas, Appellee**

### FROM COUNTY COURT AT LAW NO. 2 OF TOM GREEN COUNTY
### NO. 99-00888L2, HONORABLE DAVID READ, JUDGE PRESIDING

A jury convicted Gregori Patrick Pierce of the offense of assault causing bodily injury to a family member. The jury assessed sentence at one year's confinement and a $2,000 fine; the sentence and fine were probated for a year. Pierce complains on appeal that the court deprived him of his constitutional right to cross-examine witnesses by prohibiting him from cross-examining the complaining witness on her mental stability. He also contends that the evidence is factually insufficient to support his conviction. We will affirm the conviction and sentence.

## BACKGROUND

An altercation occurred between spouses Terry Lee Pierce and appellant[1] on February 15, 1999. Appellant (6'6 tall) admits to grabbing Terry (5'8 or 5'9) during this altercation; the dispute in the testimony was over the nature, duration, and cause of that contact.

---

[1] Terry Pierce identified appellant as her ex-husband at trial. To avoid confusion about which Pierce we mean, we will refer to Gregori Pierce as appellant and Terry Pierce as Terry.

Terry testified that she went to Steve Wood's house to talk with appellant. (Wood testified that appellant was helping him patch a hole in a wall.) Terry wanted to talk about appellant's son, Arthur, who was telling her three children to lie to cover the fact that Arthur was sneaking people into the house in violation of his probation. She testified that she saw marihuana on Wood's kitchen table and that appellant was drunk, raised his voice, and was vulgar, so she went home. She said appellant arrived at her house about ten minutes later and began getting some dress clothes; when she asked what he was doing, he told her it was none of her business. He then went into the bathroom to take a shower. She followed him in to resume their conversation outside the hearing of the children; she said he had just started running the water. Terry tried to open the shower curtain partway to communicate with him. The curtain and rod fell; she denied pulling it hard, saying it was broken and had fallen many times. She said she tried to give the curtain to appellant, but he threw it against the wall. Terry testified that after throwing the curtain away, appellant grabbed her face, digging his nails into the left side of her face. When he realized she was bleeding, he threw a towel at her to wipe off the blood (perhaps, as she told police, to keep others from seeing it).

Terry dialed 911, but hung up before talking to anyone because she heard appellant doing something. She went to look for her children in their room. Not finding them there she turned to leave and saw appellant standing in the door nude. He grabbed her throat with both hands and told her he was going to kill or beat her. After two or three minutes, her legs buckled because she could barely breathe. When he released her, he pushed her back against the wall. She got up to look for her children, but saw appellant's son, Arthur, standing with a wooden stick not moving.

She called 911 and asked for police and paramedics. When appellant heard her talking to the 911 operator, he got in his truck and waited. The police told her that they were arresting appellant for assault and because he was drunk. The police took photographs of her condition; these were published to the jury and admitted into evidence. She said the paramedics treated her scratched face, but concluded that the strained muscles and bruises on her neck did not require hospital treatment. She got an emergency protective order against appellant.

Terry denied that the curtain rod hit her or scratched her, and refused to identify a shower curtain rod that appellant identified as the rod in question. She admitted to yelling at appellant, but denied turning off the cold water in his shower or hitting him. She denied drinking at the time of the incident because she was taking Lortab and Soma, a painkiller and muscle relaxer, respectively, to cope with spinal discs ruptured in a car accident. Soma's side effects include confusion, difficulty hearing, dizziness, trembling, unsteadiness, unusual weakness, and drowsiness, among others. Lortab's side effects also include dizziness, pinpoint pupils, drowsiness, and confusion, among others.

Terry's November 1999 written statement differed in small details. She wrote that she was talking to appellant about his being drunk and high and going out again. She wrote that the children were present and yelling while appellant was nude and choking her (though she clarified at trial that they were not in the room with her and appellant at that time). She also wrote that appellant's son came at her with a bat.

Appellant agreed with parts of Terry's testimony, but diverged on critical details. He admitted arguing with Terry about Arthur. Appellant testified that he was showering to go to dinner with his mother. He said he was already washing his hair when Terry slammed the

3

bathroom door, yelled at him, and pulled the shower curtain open, inadvertently pulling the rod and curtain down. He said the rod and curtain hit Terry on the right cheek; she turned off the cold water, scalding him, hit him in the chest with her fist, and left. He got out of the shower and was drying off when Terry re-entered the bathroom. He testified that she pulled his towel off, hit him again, and blocked the doorway. He said he grabbed her by the throat with his left hand and pushed her straight back against the wall to make her stop hitting him and to get by her; otherwise, he said, she would have continued hitting him. He denied scratching her face with his hands or holding her against the wall for two or three minutes. When his son came into the house, he let her go and got dressed. Upon learning that she called 911, he waited in his truck for the police.

He admitted that he did not tell police Terry assaulted him, nor did he seek treatment for burns to his legs; he said, however, police and paramedics did not let him do either. He denied drinking on the day of the incident.

San Angelo police officer Clay Wieting responded to the domestic disturbance call. He found Terry upset, bleeding from her left cheek, and with bruises on the right side of her neck. Wieting's testimony regarding the appellant's and Terry's statements at the scene essentially matched their testimony at trial. Wieting said appellant had no injuries, did not claim scalding or self-defense, and did not deny the assault on Terry. Wieting testified that appellant's son did not see the incident. Wieting said he saw no other children. Wieting also testified that appellant smelled of alcohol and had bloodshot eyes and slurred speech.

San Angelo police officer Ed Hunger also responded to the call. Hunger testified that appellant told him that his refusal to argue with Terry caused her to pull down the shower

4

curtain; the rod or curtain cut her face.  Appellant denied hitting Terry.  Hunger could not recall if appellant had been drinking.

Steve Wood testified that, when Terry came to his house to talk to appellant, she and appellant had a verbal disagreement that seemed normal and that she left. Wood said Terry then called his house several times in succession, causing him to tell her that he would either block the line or report her.

Brooke Geiger, Terry's sixth-grade daughter, testified that when Terry and appellant started arguing, she left the house.  She went outside to do her homework, then rode her bike around the block because she could not concentrate.  When she got home, the police were there.  Terry was crying and bleeding from her face.  Terry told her that appellant had hit her. Brooke testified that appellant looked angry.

Arthur, appellant's son, said he was in the back yard hitting pecans with an inch-thick wooden dowel when a telephone call came from 911.  He answered it, spoke to the 911 officer, then went back outside.  Despite hearing Terry yelling, he went about his business because it was nothing new.  Eventually, he walked back into the house and saw Terry and appellant come out of the bathroom.  She had a scratch on her face, but Arthur did not see her get scratched.  Terry was yelling, and appellant was trying to wipe blood off her face.  Appellant started to yell at her, Terry threw the towel in his face, and appellant grabbed her around the throat with one hand and backed her up two or three steps.  Appellant released her, went to his room to dress, then went out on to the porch.  Terry yelled at Arthur for a while, so Arthur joined appellant on the porch.  Terry called 911 again.

5

Appellant made a bill of exceptions by calling Mental Health Mental Retardation service coordinator Fred Smith. Smith testified that he had worked with Terry at her request since the month after the February 1999 assault. He said Terry was hospitalized with over-medication problems and suicidal ideation in July 1999. He said she was diagnosed with major depression (which included overwhelming sadness, hopelessness, inability to experience pleasure, and low self-esteem) and a borderline personality disorder (which included identity confusion, extreme moodiness, impulsivity, and a tendency to push and pull simultaneously in relationships).

An information was filed against appellant on April 14, 1999. The culpability phase of the trial occurred on January 27-28, 2000.

**DISCUSSION**

In his first issue, appellant contends that the county court violated his right to confront witnesses by refusing to allow him to introduce evidence of Terry's mental health. He complained at trial that the evidence of her hospitalization subsequent to the assault was relevant to her credibility, her state of mind at the time of the assault, and her state of mind in November 1999 when she gave a written statement.

The court of criminal appeals has called the right to cross-examine witnesses "one of the greatest constitutional rights that an accused person might have." *Virts v. State*, 739 S.W.2d 25, 29 (Tex. Crim. App. 1987). It includes the right to ask about mental illness or disturbance that "might tend to reflect on the witness's credibility." *Id*. The right to cross-examine has limits, however; the trial judge "retains wide latitude to impose reasonable limits on cross-examination based upon concerns about, among other things, harassment, prejudice,

6

confusion of issues, and the witness's safety." *Id*. at 28. Because the definition of "mental illness" includes conditions ranging from nervousness through thoroughly debilitating psychoses, the court wrote,

> the mere fact that the State's testifying witness has in the recent past suffered or received treatment for a mental illness or disturbance does not, for this reason alone, cause this kind of evidence to become admissible impeachment evidence. If the witness is shown to have been suffering from a recent mental illness, prior to the occurrence of the event in question, and such might be considered a "persistent disabling disturbance of his mental and/or emotional equilibrium, manifested through persistent maladjustment and more or less irrational, even bizarre behavior and speech," Brussel and Cantzlar, [*The Layman's Dictionary of Psychiatry* (1967 edition)], whether psychic or organic in origin, then, of course, the trial judge should permit the jury to hear this kind of evidence.

*Id*. at 30. The court held that the decision of whether the mental illness is admissible evidence is necessarily ad hoc, and that appellate courts must give great deference to the trial court's decision on admissibility. *Id.* at 28. We reverse only for an abuse of discretion. *Ramos v. State*, 819 S.W.2d 939, 941 (Tex. App. Corpus Christi 1991, pet. ref'd); *see also Miller v. State*, No. 1939-99, slip op. at 7 (Tex. Crim. App., Jan. 17, 2001) (in crack delivery case, reviewing exclusion of defense's evidence, offered to show coercion to deliver, of assault by dealer *after* delivery).

The evidence excluded did not show Terry suffered mental illness before or during the incident. Evidence of mental disturbance does not, without more, prove earlier mental disturbance; a spousal assault in February might very well provoke depression in March. The evidence offered regarding Terry's mental condition at the time of the assault that regarding her use of Soma and Lortab and their side effects was admitted. Without evidence of a link between

7

the subsequent hospitalizations and her condition at the time of the incident, the county court did not err by excluding the evidence of Terry's mental condition after the incident.

Nor does the proximity of treatments to the November 1999 written statement require reversal. The November statement does not differ from her primary testimony on material aspects of the incident—the argument, the altercation in the shower, and appellant scratching her face and choking her. Where the statement differs from her testimony, it casts appellant and his son in a less favorable light; in the statement, she said appellant was "again" drunk and high, implied that he was nude in front of her children, and that Arthur came after her with a bat. The State did not use the statement in prosecution; appellant was arrested and the information was filed months before it was written, and the State did not use it at trial. Appellant offered it after the court had excluded evidence of Terry's mental health treatments. If appellant's purpose was to show Terry's story had varied, this purpose was served without evidence of Terry's intervening mental treatments; appellant cross-examined Terry and not only showed these inconsistencies but got her to recant or justify them. If the purpose was to show that this embellished version was the product of mental instability, the court did not err by blocking that purpose; that mental illness perhaps caused Terry to exaggerate after the incident and the information but before trial has no bearing on either the incident, the prosecution, or her competence to testify at trial.

Appellant did not expressly challenge Terry's competence to testify at trial, nor did the offered testimony address her condition at trial.

The court allowed appellant to cross-examine Terry and show inconsistencies in her November statement, but prevented him from presenting evidence of her mental illness between

8

the incident and trial which was not shown to bear upon her condition at the time of the incident or at trial. We find no error and resolve issue one against appellant.

In his second issue, appellant challenges the factual sufficiency of the evidence. The court of criminal appeals has reiterated the standard of review for such challenges:

> [T]he Courts of Appeals are constitutionally empowered to review the judgment of the trial court to determine the factual sufficiency of the evidence used to establish the elements of an offense. *Cain v. State*, 958 S.W.2d at 408; *Clewis v. State*, 922 S.W.2d at 129-30. In determining the factual sufficiency of the elements of the offense, the reviewing court "views all the evidence without the prism of 'in the light most favorable to the prosecution,' [i.e., views the evidence in a neutral light,] and sets aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis v. State*, 922 S.W.2d at 129. The court reviews the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 832, 118 S.Ct. 100, 139 L.Ed.2d 54 (1997). "In conducting its factual sufficiency review, an appellate court reviews the fact finder's weighing of the evidence and is authorized to disagree with the fact finder's determination." *Clewis v. State*, 922 S.W.2d at 133. This review, however, must employ appropriate deference to prevent an appellate court from substituting its judgment for that of the fact finder, and any evaluation should not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility given to witness testimony. *Jones v. State*, 944 S.W.2d at 648.

> \* \* \*

> Unless the available record clearly reveals a different result is appropriate, an appellate court must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered. This evidence is then accorded the appropriate consideration by the reviewing court in the context of its overall analysis of the relevant evidence.

*Johnson v. State*, 23 S.W.3d 1, 6-9 (Tex. Crim. App. 2000).

The record supports the conviction. The inconsistencies in Terry's statement and testimony were in the record, as was her refusal to positively identify the shower curtain rod in evidence.[2] The record contains appellant's testimony and his son's supportive testimony, as well as the small inconsistencies between Arthur's version of where and to which police officer he spoke. Also in evidence were the shower curtain rod and the photographs of Terry. The jury convicted appellant on this record. We cannot conclude that the record "clearly reveals a different result is appropriate." We therefore must resolve issue two against appellant.

## CONCLUSION

Having resolved both issues against appellant, we affirm the conviction and sentence.

_____

Mack Kidd, Justice

Before Justices Kidd, Yeakel, and Jones[*]

Affirmed

Filed: February 8, 2001

Do Not Publish

---

[2] She recognized it as a broken shower curtain rod like the one from the incident, but refused to definitively declare it to be the same rod.

\*   Before J. Woodfin Jones, Justice (former), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 75.003(a)(1) (West 1998).