

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-17-00815-CR

Issac **WILLIAMS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 187th Judicial District Court, Bexar County, Texas
Trial Court No. 2014CR8370B
Honorable Joey Contreras, Judge Presiding

Opinion by:   Liza A. Rodriguez, Justice

Sitting:        Irene Rios, Justice
                Liza A. Rodriguez, Justice
                Lori Massey Brissette, Justice

Delivered and Filed: December 31, 2024

AFFIRMED

After a jury trial, Issac Williams was found guilty of continuous trafficking of persons and was sentenced to fifty years of imprisonment. He brings twenty-three issues on appeal. On original submission, this court reached Williams's ninth issue and held the trial court erred in denying his request for a lesser-included instruction on human trafficking of persons. *See Williams v. State*, 582 S.W.3d 612, 614-15 (Tex. Crim. App. 2019), *rev'd*, 662 S.W.3d 452 (Tex. Crim. App. 2021). The court of criminal appeals reversed, holding that Williams had failed to

preserve his issue for appeal by not "point[ing] to the specific evidence in the record that raised the lesser-included offense, even after he was asked to do so by the trial court." *Williams v. State*, 662 S.W.3d 452, 456 (Tex. Crim. App. 2021). The court of criminal appeals remanded the cause for this court to consider the remaining issues.[1] *Id*. at 464. We affirm.

## BACKGROUND

Williams was accused of trafficking B.F., a minor, during a period that was more than thirty days in duration. During the guilt/innocence portion of trial, the following witnesses testified: the complainant B.F.; Sergeant John Elizarde; Agent Shawn Hallett; Christopher Hill; Agent Johnny Hirst; Sergeant Stormey Jackson; Laurie Smith, and Williams.

At trial, B.F. testified about her home life, meeting Williams, and how she engaged in prostitution with Williams and a woman named Deborah Ameia Cooper. As a teenager, B.F. did not have a stable home life. She and her mother "argued a lot, and so those arguments sometimes turn[ed] into scruffles [sic], and sometimes, [her mother] would kick [B.F.] out." When B.F. was thirteen years old, she lived in Maryland[2] with her mother and younger brother. According to B.F., while the family was living in Maryland, they were "homeless for a good while," "on the street homeless." B.F. explained,

> I had to basically have sex for money, so we could get food because we didn't have any money at all. So, it – it wasn't something that I wanted to do, but I needed to feed [my younger brother] because he's, you know, he's sick, and he had the CMV virus. He's deaf; he's autistic; and it takes a lot to take care of a person like that, and I always felt like I had to help. So, I did that for my mom, even though she didn't have any money.

---

[1]Williams then filed a motion for rehearing in the court of criminal appeals, which was ultimately denied by the court. The court of criminal appeals did not issue its mandate until August 24, 2022.
[2]B.F. and the family later moved to Killeen, Texas.

When asked on cross-examination who suggested to her at thirteen years old that she should prostitute herself for her family, B.F. was adamant that "[n]o one suggested it." She testified she thought of it all herself.

According to B.F., when she was fifteen years old, she met Williams on social media, specifically on a website called Tagged. Williams was in his late twenties. B.F. testified she and Williams messaged each other for about six to seven months before they met in person in December 2013[3] at Lions Park in Killeen, Texas. The park was within walking distance from where she lived with her mother. B.F. testified she and her mother had gotten into an argument, and her mother had "kicked her out" of the apartment. According to B.F., she and Williams talked for about an hour in his Cadillac. Williams then began to ask B.F. about her past sexual experiences, and B.F. told him about prostituting herself in Maryland:

> [H]e just kept saying he would buy me stuff, that he can get me—he can get me money, you know, so I could have my own money, so I can do what—basically, what I wanted to do. And, you know, "Your mom's not taking care of you. Now, why would she, you know, kick you out? I can give you basically something better than she had." . . . He kind of, like I say, sugarcoated to have sex for money, but it wasn't just blatant, "Okay. Do you—Do you," you know, "Do you want to have sex for money?" It was more persuasive, kind of, sort of, I guess I can say.

B.F. testified she and Williams then had sex in the car, and Williams later took her back to a hotel. B.F. testified, "[T]hat's when the actual and real conversation came up of what I was actually going to be doing." On his mobile phone, Williams pulled up the website Backpage and navigated to the "adults" and then to the "escorts" section. B.F. testified Williams explained the entire process of placing Backpage ads to find customers and how B.F. could get started. When asked how this made her feel, B.F. replied,

---

[3] B.F.'s testimony is not consistent on the issue of her age at the time she first met Williams in person. She is clear, however, that she first met Williams in person in December 2013. As her birthday is March 19, 1997, she was sixteen years old when she first met Williams in person.

It made me feel happy, but I was confused because, like, okay, I did this before; but at that time, I didn't know what an escort was. I thought it was, you know, the people who like, you know, walk people like out of a club or, you know, like a police officer, they escort you around, not a prostitute. I don't know.

According to B.F., Williams said she would keep some of the money she made. However, "over time, [B.F.] realized that [she] got none of it, that he kept all of it."

B.F. testified Williams then introduced her to a twenty-year-old woman, whom Williams called "Kandy." During the trial, this woman is referred to by many names, including "Ameia," "Mia," "Deborah," and "Kandy." Her legal name is Deborah Ameia Cooper. According to B.F., because Williams called the woman "Kandy," she also used the name "Kandy." After this first meeting with Kandy, B.F. accompanied Williams and Kandy to Wal-Mart so Williams could buy B.F. some "cute underwear." When they all returned to the hotel, Williams took pictures of B.F. and Kandy in their underwear. He then created an advertisement on Backpage with the pictures. B.F. testified about the process of posting Backpage ads:

[W]hat you do is you first get a gift card. It's a Vanilla gift card. And to post a page on Backpage, it's about $12. But the thing about it is, is you're competing with over 50,000 girls from all different countries, states, cities, so you constantly have to keep posting an ad to get it to the top because you have to get the first three pages in order for someone to call you, which is basically the client. And then, you just proceed from there.

The Backpage ads that were introduced as exhibits at trial look similar. They all show the email address of krobin209@yahoo.com. They all include pictures of B.F. and Kandy. After the pictures, there is a message. Sometimes the message is from "Amber," a name used by B.F. Sometimes the message is from "Kandy." Whether the message claims to be from Amber or Kandy, the text is the same: [4]

Hi, Im Kandy.!!! [or "Hi, Im Amber!"] Come enjoy yourself in a more upscale atmosphere. If you like my pictures, you will love me in person. I love to have a good time.. Some come have some fun with me :) you wont be disappointed! I am

---

[4] The message from the ad is quoted verbatim with grammatical and typographical errors.

Native American, Blk & White. More like the Girl Next Door. Thank you! 2 GIRL SPECIAL!!
50 qk
80 hh
120 hr
**PLEASE TEXT OR EMAIL** AND MAKE SURE U SAY UR FROM BACKPAGE OR NO REPLY *NO CALLS* krobin209@yahoo.com
254-245-2663 KANDY
254-393-5060 AMBER
IN/ OUT CALL NOW!!
Poster's age: 20

B.F. explained that "qk" meant ten minutes, "hh" meant a half hour, and "hr" meant an hour. Thus, the charges were $50 for ten minutes, $80 for thirty minutes, and $120 for an hour. According to B.F., they traveled from Killeen to Austin to San Antonio, and Williams set the prices depending on which city they were in. Williams also set a goal of $600 per day for B.F. and $800 per day for Kandy. B.F. testified she and Kandy would stay in a hotel room while Williams either waited in his Cadillac or stayed in his own hotel room. B.F. would communicate with Williams by text. After B.F. talked to a client and the client agreed to a service, B.F. would text Williams:

> I would say a QK, which he knows is quickie for $50, and then, he'll reply back. And then, the client—I would go get the client, and I would bring them upstairs, and I would text him "I," which means inside, which means the client is inside the room with me, and I'm about to get the money. And that basically lets him know, you now, time by time what I'm doing. Once I'm done, once I've got the money, I would text W, and then, he would text C or H. "C" meant coming up, which means he's coming up to the room, or he'll text "H" was – which is here I come, you know; I'm about to come up to the room.

B.F. testified the customers never saw Williams. Kandy would either remain in the room "if the client was okay with it," or "step outside the room and go down the hall, but she had to stay close just in case she had a client." "And we would kind of swap back and forth."

According to B.F., she began working with Williams and Kandy the week after she first met Williams in person (i.e. December 2013). They all lived in Williams's apartment on Winkler Avenue in Killeen, which was across the street from B.F.'s high school and about a five-to-ten-minute walk from her mother's apartment. They worked every day except Sunday, because on Sundays they went to church.[5]

At the time she left home to move in with Williams and Kandy, B.F. was on juvenile probation "for stealing out of a car." B.F. testified she was "supposed to be in the house before 7:00 p.m." and "check in" with her probation officer every week. However, once she started working with Williams and Kandy, and was always out of town, she stopped making her weekly appointments with her probation officer.

On August 19, 2014, Williams, B.F., and Kandy were all arrested at a hotel in Killeen, Texas. B.F. testified,

> Mia [Kandy] had told me she was texting a client, that he was coming by, so I said okay. I was going to go downstairs and get me something to snack on because I was a little hungry. After I got my snack, I came back upstairs, and Mia, she wanted to go get something to snack on and, you know, get something to eat because we were hungry. And I believe we actually didn't have any more TV dinners, so she went down. And I was actually about to light a cigarette, and I kept sitting there thinking, "Wow, she's taking a really long time," and she walks pretty fast. So, I just kept sitting there. And just as I was about to light my cigarette, the door opens. And I'm thinking it's her, so I'm not paying attention, and it's police officers. And they're saying, "Are you [B.F.]?" And, immediately, I freeze, and I'm looking. They just kept saying it, "Are you [B.F.]?" And I said, "Yes." And they said, "Okay. Well, we've been looking for you for a really long time," and they said, "Are you okay?" I said, "Yes." And they said, "Is he here?" I said, "No." I said, "Who" – and you know, I already knew who they were talking about, but I was really mostly just in shock because they were pointing guns at me, but I know it – it wasn't, you know, like that. After that, they had handcuffed me and took me downstairs where I had saw Kandy sitting [in] a chair, and they were talking to me. I forgot about what. And then, just as they were sitting there talking to me, I see Issac [Williams] pull up. But at first, I knew he was coming. I'd seen his car. But first, he pulled up to the side door and then to the front entrance of the hotel. And immediately, I start freaking out because he's

---

[5]B.F. testified the only exception to this general rule was when they had not made enough money during the week.

really big on not telling the police, the feds anything about what we're doing. He told me, "If you get caught, deny everything because if you get caught, it's a misdemeanor for probation. So, if you get caught, you go to jail, I will bail you out, and then, we'll just keep going." And so, when I had seen him, I told them—I was like, "You got to move me somewhere else." I was saying, "You got to move me somewhere else because if he sees me, I'm going to be in like big ass trouble." And they were like, "Okay. We're going to move you somewhere else." And that's when they had arrested him in front of the hotel.

B.F. testified she was arrested because she had a warrant for her juvenile probation violations. After her arrest, she talked with Sergeant Stormye Jackson, an investigator with the Special Investigations Unit of the Attorney General's office. B.F. told Sergeant Jackson about Kandy's and Williams's roles.[6]

Agent Hallett, a special agent with the Texas Department of Public Safety's Criminal Investigations Division, testified that he was part of an investigation seeking to find juvenile victims of human trafficking. He began his investigation by reviewing ads on Backpage and looking for images of people who appeared to be minors. Once he found an image of a person whom he believed to be a minor, he would try to identify the person using phone numbers, social media, and other databases to which he had access. During his investigation, he found one of the ads featuring "Kandy" and "Amber," and believed the images depicted a minor. He then ran the phone numbers contained in the ad through every database, including Facebook and other law enforcement databases. He was able to link one of the numbers in the ad to a Facebook account associated with B.F. whom he discovered was a juvenile.

A subpoena was then prepared and sent to Backpage for the email on the ad, krobin209@yahoo.com. In response to the subpoena, Backpage produced over 3,000 pages of ads and invoices related to krobin209@yahoo.com. The dates on the ads range from December 9, 2013 to August 14, 2014. On all these ads, the email associated with the Backpage account is

---

[6] Kandy entered into a plea-bargain agreement with the State and was placed on community supervision. She failed to report to her probation officer, and at the time of trial, was a fugitive.

krobin209@yahoo.com. On almost all the invoices associated with the ads, the account person listed is "kandy" at a fake address (123 Jake St.) in Killeen, Texas. However, some of the invoices list "Issac Williams" at Williams's real address of 1309 Winkler Ave., Killeen, Texas. Williams's name appears on these invoices on the following dates: July 20, 2014, July 21, 2014, July 27, 2014, July 30, 2014, August 2, 2014, August 3, 2014, August 4, 2014, and August 5, 2014. At trial, every document produced by Backpage was admitted in evidence as State's Exhibit 1 over defense counsel's objection.

After obtaining the documents from Backpage, Agent Hallett testified he set up an undercover operation. On August 14, 2014, he contacted by text one of the phone numbers listed on the ad ("Kandy (254) 245-2663") and tried to set a date for Monday, August 18, 2014. However, he did not receive a response to his text until the evening of August 18th. According to Agent Hallett, "Kandy" agreed by text to a date on the following day. Agent Hallett requested that both girls be present for the date. On the afternoon of August 19, 2014, Agent Hallett texted "Kandy" and, through text messages, was led to a hotel in Killeen, Texas. Deborah Ameia Cooper, otherwise known as "Kandy," let Agent Hallett in through a side door to the hotel. As he was following Kandy up a stairwell, Sergeant John Elizarde took her into custody. Agent Hallett then went to Kandy's hotel room and saw the door propped open. He announced "police," opened the door, and saw B.F. Agent Hallett testified he recognized B.F. from the ads and called out her name. After B.F. responded, he entered the room. Because he knew there was an outstanding juvenile warrant out for B.F., he took her into custody at about 2:00 p.m. He then gave B.F. to Stormye Jackson, an investigator with the Attorney General's Office.

According to Stormye Jackson, she obtained basic information from B.F., such as her age, date of birth, what she had been doing at the hotel, and who else had been involved. B.F. gave the investigators Williams's name and described his Cadillac.

Agent Hallett testified that the hotel room was registered to Kandy. They found three cell phones in the room and a box of condoms. According to Agent Hallett, when everyone had finished their respective duties at the hotel, they started to escort B.F. out:

> And as we're walking out the front door, [B.F.], for lack of a better term, has a complete meltdown, trying to – basically, almost falling to the ground. You could tell that it was a very fearful thing for her as she began to say, "That's him."[7]

Agent Hallett looked up and saw a Cadillac that matched B.F.'s description of Williams's car. Agent Hallett and a couple of other agents went to the parking lot. Agent Hallett recognized the driver as Issac Williams. Agent Hallett testified that as Williams saw the officers come out of the hotel, he backed out of a parking spot and was attempting to maneuver in the parking lot. Agent Hallett believed Williams was attempting to leave, so he and the other officers stopped Williams's car. Agent Hallett placed Williams under arrest and searched his person and vehicle. On Williams's person, Agent Hallett found multiple gift cards. In the car, he found four cell phones and boxes of condoms. Agent Hallett testified he made the inventory of what had been seized at 4:20 p.m. He was later able to link the gift cards to the Backpage ads posted by krobin209@yahoo.com.

Sergeant John Elizarde, an investigator with the Attorney General's Office, testified to the same facts as Agent Hallett with regard to the Backpage investigation, the process under which they found the ads in question, how they identified B.F. in the ads through Facebook, how they subpoenaed Backpage for the ads related to the krobin209@yahoo.com email, and the sting

---

[7] All the law enforcement officers present testified similarly. Stormye Jackson testified B.F. "started hyperventilating" and having a "panic attack" while she was saying, "That's him. That's him."

operation on August 19, 2014. He added that they linked "Amber" in the Backpage ad to B.F. by putting the phone number listed for "Amber," (254) 393-5060, into Facebook. Once they tracked down B.F.'s identity through her Facebook page, they determined she was "a runaway out of Killeen" and had been reported missing in May 2014 by her mother. He also testified that "Issac" on Williams's driver's license is spelled the same way "Issac" is spelled on the Backpage invoices. Further, the address listed on the Backpage invoice, 1309 Winkler Ave., is the same address listed on Williams's driver's license.

The three cell phones found in the hotel room and the four cell phones found in Williams's car were admitted in evidence. "Device 1," "Device 2," "Device 6," and "Device 7" were found in Williams's car. "Device 3," "Device 4," and "Device 5" were found in the hotel room. Johnny Hirst, a former special agent with the Texas Department of Public Safety's Criminal Investigations Division testified he took photos of the hotel room and prepared a search warrant and affidavit for the cell phones. All seven phones were sent to Christopher Hill of the Victoria Police Department's Cyber Crimes Unit for analysis.

Hill testified Device 1 was a ZTE phone with the phone number (412) 596-4519. He could not download the phone because the software he uses to extract information was not supported by the device. He did take several photos of the contents of the phone, which were admitted in evidence.

Device 2 was a black Cricket Samsung. According to Hill, Device 2 no longer had a working phone number, but at one point used the same SIM card as Device 4 and thus the same phone number of (254) 245-2663. Hill was able to recover call log contacts, a timeline, a user dictionary, and some data files from Device 2.

Device 6 was a Samsung Galaxy S5. According to Hill, Device 6 was associated with two numbers: (254) 285-7788[8] and (254) 393-5060.[9] Hill testified Devices 5 and 6 both had the phone number (254) 393-5060 at some point because they used the same SIM card. Hill was able to do a complete download on this phone, which was admitted in evidence. The exhibits containing the download of contents from the phone reflected messages were sent to the phone from someone who called himself "Issac from fb." A message dated December 18, 2013 from "Issac" stated, "I'm right here, and I'm ready to be there for you." Further, a TxTag toll account on the phone had the billing address of 1309 Winkler Ave, Apartment 838, Killeen, Texas, which was William's home address. The phone listed the contact "Kandy" as (254) 245-2663.[10] There was also a contact listed in the phone as krobin209@yahoo.com. Issac Williams's email was listed as a contact in the phone as tailz286@gmail.com. B.F. was listed as a contact with two phone numbers: (978) 533-4697 and (254) 393-5060. Kandy was listed as a contact with two phone numbers: (254) 449-1764 and (254) 245-2663. The internet history of the phone's browser showed that on July 29, 2014, a backpage ad was accessed by the phone and purchased using the phone.

Device 7 was a Motorola flip phone. According to Hill, the phone number associated with this phone was (254) 449-1764. Because Device 7 did not support the software Hill used to do a forensic analysis, he was not able to download the phone. However, he did take pictures of the contents of the phone. Hill found a contact for "Lee" with the phone number (254) 393-5060.[11] A message was sent to Lee from Device 7 stating, "Well, wait. She got one." Hill also found communications between Device 7 and (254) 245-2663.

---

[8] Williams testified this was his phone number.
[9] B.F. testified this was her phone number.
[10] Hill testified Device 4 is associated with this phone number.
[11] B.F. testified this was her phone number.

According to Hill, the phone number (254) 245-2663 was associated with Device 4, which was a Samsung Galaxy S4 found inside the hotel room. Thus, Hill testified a phone found in Williams's car was communicating with a phone found in the hotel room. The phone number (254) 245-2663 was also the phone number listed for "Kandy" on the Backpage ads.[12] When B.F. testified on direct examination, she stated this phone number belonged to Williams. However, on cross-examination, she stated that she did not know the phone number for Kandy and finally agreed that this number belonged to Kandy. Hill testified he was able to do a forensic analysis and retrieve text messages between this phone and (832) 263-6021, the number used by Agent Hallett in his undercover operation.

Also found in the hotel room was Device 3, a cell phone manufactured by Huawei. Hill testified this phone was associated with the phone number (254) 393-5059. According to Hill, he was not able to examine the contents of this phone because it was locked. He was able to examine the 8 GB micro SD card and SIM card on the phone, which had some call logs and contacts, but did not have any text messages.

Finally, the last phone found in the hotel room was Device 5, a phone manufactured by Alcatel and associated with (254) 393-5060. B.F. testified this was her phone number. According to Hill, he was not able to perform a forensic analysis on this phone because it had an active passcode. He was able, however, to retrieve some photos from the SIM card. Hill testified Device 5, which was found in the hotel room, and Device 6, which was found in Williams's car, have the same phone number. Hill concluded Devices 5 and 6 used the same SIM card at some point.

---

[12] Device 6 had a contact for "Kandy" with this phone number. Hill testified Device 4 is associated with this phone number.

Sergeant Elizarde testified that a subpoena was also issued to Yahoo for the krobin209@yahoo.com email. The documents received in response show that "Kandy Robinson" was the person who created the email account on June 2, 2013. An alternate email associated with the account was tailz286@gmail.com.[13] The alternate phone listed for the yahoo account was (254) 245-2663. This was the phone number listed for "Kandy" on the Backpage ads and associated with Device 4, which was found in the hotel room. A second phone number listed on the Yahoo account was (254) 449-17641. This number has too many digits to be an accurate phone number; however, it is similar to the phone number for Device 7, which was (254) 449-1764. Device 7 was found in Williams's car. B.F. testified that krobin209@yahoo.com was Williams's email address. Williams testified it was Kandy's email address.

During questioning, Sergeant Elizarde testified that there was a text message sent on July 8, 2014 from Device 4, a phone found in the hotel room and associated with Kandy, to Device 5, a phone also found in the hotel room and associated with B.F.'s phone number. The text message stated, "Make sure Issac doesn't see you." At trial, defense counsel argued this text message was evidence that (1) Device 4 was not Williams's phone, but was Kandy's phone, and (2) Kandy and B.F. were doing something they did not want Williams to know about.[14] Additionally, defense counsel, during questioning of Sergeant Elizarde, pointed out that before the date of this text message, none of the Backpage ads listed Issac Williams's name. However, one month later, Williams's name was listed on some of the Backpage ads. Thus, the defense argued the evidence showed Kandy and B.F. had a motive to falsify Williams's name on the invoices because they were angry at him about something.

---

[13] Williams testified this was his email address. According to Williams, he allowed Kandy to use his email address.
[14] During his testimony, Williams claimed he had no idea Kandy and B.F. had been prostituting themselves.

Finally, the State presented evidence of bail jumping on Williams's part. Laurie Smith, the court coordinator for the 187th District Court, testified that Williams did not show up for a previous trial setting. The State argued evidence of his bail jumping showed Williams's consciousness of guilt.

Williams testified in his own defense. According to Williams, in November 2010, he was going to school in Pennsylvania to obtain his associate's degree and was living with his aunt. He met Kandy through friends, and they had an on-and-off relationship. Williams completed his associate's degree and found a job examining propane gases. However, in 2013, he was laid off and decided to return to Texas. Kandy moved with him, and in May 2013, they moved in with Williams's father. Williams testified that in October 2013, he and Kandy leased their own apartment in Killeen. They met B.F. at a beauty supply store near both their and B.F.'s apartments. Williams testified that B.F. and Kandy bonded over a discussion about hair. At the end of the meeting, they all became friends on Facebook. According to Williams, Kandy and B.F. were good friends and would go out a lot together. Williams claimed that B.F. did not live with him and Kandy, but she was over a lot. Williams admitted that he flirted with B.F. on Facebook and later through text, but claimed that in December 2013, he blocked B.F. on Facebook. Williams testified B.F. became angry and claimed he was going to "pay" for blocking her.

Williams admitted that tailz286@gmail.com was his email address but claimed Kandy had access to it. He testified krobin209@yahoo.com was Kandy's email address, which she used "to do hair and stuff." Williams was adamant that he never "pimped out" B.F. or Kandy. He also claimed he never met B.F. in person to recruit her.

According to Williams, in July 2014, because his unemployment benefits were about to expire (he had not found a job since moving back to Texas), he decided to move to Austin to find work. On August 1, 2014, he and Kandy moved to their new apartment in Austin. He testified B.F. came to Austin and picked up Kandy. They then went to Killeen together and stayed at the Sleep Inn. Williams testified he later drove to the Sleep Inn and spent time with Kandy; B.F. was not at the hotel, but later came into the room. Williams testified Kandy and B.F. wanted to smoke marijuana, and he left to visit a friend. He then returned to Austin. According to Williams, the next day, he drove back to Killeen to pick up Kandy at the hotel. When he arrived, Kandy, B.F., and B.F.'s boyfriend were in the hotel room. Williams testified Kandy "pulled [him] to the side" and gave him all these gift cards and credit cards. She told him B.F. was stealing from her and wanted Williams to keep the cards for her. According to Williams, he was then asked by B.F.'s boyfriend for a ride to the repair shop to pick up his car. Williams testified he later came back to the hotel to pick up Kandy. He tried to park, but the lot was full. He was trying to turn his car around to find another parking spot when "these guys run in front of my car at gunpoint" and stopped his car. Williams got out of the car and was immediately arrested. His person and his car were searched.

The officers found four phones in Williams's car. Two were found in his trunk and two were found inside the passenger compartment. Williams testified his phone number was (254) 285-7788, which was associated with Device 6. Device 6 was found inside the passenger compartment of Williams's car. Williams explained all the incriminating information found on Device 6 was a result of him and Kandy switching phones a few days before. According to Williams, they had also "merged" their phones at the mobile phone store. Williams testified Kandy had four phones because she kept buying new ones and upgrading.

Williams testified that Device 7, the flip phone also found in the passenger compartment of his car, belonged to Kandy. When asked by the State how Device 4, a phone associated with "Kandy's" number and found in the hotel room, could have been communicating that day with Device 7, Williams changed his testimony. He blamed B.F.'s boyfriend, whom Williams had given a ride. Williams testified Device 7 must have fallen out of the pocket of the boyfriend's pants. Williams suspected that B.F.'s boyfriend was the one working with B.F. Williams claimed Kandy had told him B.F. and her boyfriend had been trying to recruit her, information Williams claimed he had not known at the time of the arrest but learned later. According to Williams, the boxes of condoms found in his trunk were his condoms. He claimed that the condoms found in the hotel room were different than the ones he had in his trunk.

Williams admitted that the messages on his phone the day of the arrest show that he was flirting with other women. But, Williams argued that he was only flirting and was not recruiting women for prostitution. After all the evidence was presented, Williams was found guilty of continuous trafficking of B.F. and was sentenced to fifty years of imprisonment.

### ISSUES ONE TO THREE: EVIDENCE RELATING TO COMPLAINANT'S MENTAL HEALTH

In his first three issues, Williams argues that his due process rights and his rights under the Confrontation Clause were violated because the trial court limited his ability to cross-examine B.F. "about her mental health issues." Specifically, Williams sought to admit evidence relating to B.F.'s April 3, 2014 psychological examination by Dr. Pugliese while B.F. was under supervision of a juvenile court in Bell County, Texas. Williams included Dr. Pugliese's evaluation in his offer of proof, which was labeled Defendant's Exhibit 18. Dr. Pugliese's evaluation contains a section titled "Personal History." This section reflects statements made by B.F.'s mother to Dr. Pugliese. On appeal, Williams points to these hearsay statements made by

B.F.'s mother, along with Dr. Pugliese's impression that B.F. was "a very angry and resentful youngster with severe oppositional tendencies." Dr. Pugliese's diagnostic impressions were post-traumatic stress disorder, oppositional defiant disorder, and conduct disorder. Williams argues that "B.F.'s mental health was severe and not limited to depression as B.F. reported" and that because "B.F.'s mental health was an issue at the time of the charged offense," "it was a relevant area of inquiry." He argues that by preventing him from cross-examining B.F. about her mental health, his constitutional rights under the Due Process Clause and Confrontation Clause were violated. In response, the State contends Williams has failed to articulate how B.F.'s psychological history affects her credibility. We review the trial court's decision to allow cross-examination for an abuse of discretion. *Cantu v. State*, 939 S.W.2d 627, 635 (Tex. Crim. App. 1997).

The Due Process Clause affords a defendant the right to offer testimony, compel witnesses to attend trial, and the right to present a defense. *See Washington v. Texas*, 388 U.S. 14, 18 (1967). The Sixth Amendment provides that an accused has a right to confront his accusers. *See Crawford v. Washington*, 541 U.S. 36, 42 (2004). In support of his argument that his constitutional rights were violated, Williams relies on *Virts v. State*, 739 S.W.2d 25 (Tex. Crim. App. 1987). In *Virts*, the State's witness was an accomplice as a matter of law and a co-defendant who testified to the defendant's participation in the murders. *Id*. at 27. The court held that denying the defendant the ability to cross-examine this accomplice and co-defendant about her recent mental illness was error because her illness may have affected her credibility and memory of events at the scene of the murders. *Id*. at 30. However, the court explained that a defendant's right to confront a witness was not unlimited:

> In deciding whether evidence going to the fact that a witness has suffered in the recent past, before the event in question occurred, a mental illness or mental

disturbance is admissible evidence, given the imponderables of mental illness and mental disturbances, such decision must, of course, be decided on an ad hoc basis, and with great deference being given the trial judge initially deciding whether that evidence should be admitted for the jury's consideration.

*Id*. at 28. The court explained that a trial judge retains wide latitude to impose reasonable limits on cross-examination based upon concerns about, among other things, harassment, prejudice, confusion of the issues, and the witness's safety. *Id*.

In *Davis v. Alaska*, 415 U.S. 308, 316 (1974), the Supreme Court made a distinction between an attack on the general credibility of a witness and a more particular attack on credibility that reveals "possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." Under *Davis*, "the exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." "However, as Justice Stewart noted in concurrence, the Court neither held nor suggested that the Constitution confers a right to impeach the general credibility of a witness through otherwise prohibited modes of cross-examination." *Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009) (discussing *Davis*). "Thus, the *Davis* Court did not hold that a defendant has an absolute constitutional right to impeach the general credibility of a witness in any fashion that he chooses." *Id*. "But the [C]onstitution is offended if the state evidentiary rule would prohibit him from cross-examining a witness concerning possible motives, bias, and prejudice to such an extent that he could not present a vital defensive theory." *Id*. at 562-63.

"Under Rule 404(a)(3) of the Texas Rules of Evidence, a defendant may always offer evidence of a pertinent character trait—such as truthfulness—of any witness." *Hammer*, 296 S.W.3d at 563. "But, under Rule 608 the witness's general character for truthfulness may be shown only through reputation or opinion testimony." *Hammer*, 296 S.W.3d at 563. "A witness's

general character for truthfulness or credibility may not be attacked by cross-examining him (or offering extrinsic evidence) concerning specific prior instances of untruthfulness." *Id*. A witness may be cross-examined on specific instances of conduct only "when they are used to establish his specific bias, self-interest, or motive for testifying." *Id*. "Under Rule 613(b), the opponent must first cross-examine the witness with the circumstances surrounding the bias, interest, or motive, and, if the witness denies the circumstances or the motive, the opponent may introduce extrinsic evidence to prove the motive or bias." *Hammer*, 296 S.W.3d at 563.

Further, the "general rule is that a party is not entitled to impeach a witness on a collateral matter." *Norrid v. State*, 925 S.W.2d 342, 347 (Tex. App.—Fort Worth 1996, no pet.). "The test as to whether a matter is collateral is whether the cross-examining party would be entitled to prove it as part of his case tending to establish his plea." *Id*. (quoting *Ramirez v. State*, 802 S.W.2d 674, 675 (Tex. Crim. App. 1990)).

In reviewing Williams's bill of exception, Dr. Pugliese's notes amount to a series of specific instances of conduct that may not be used to attack a witness's character for truthfulness. *See* TEX. R. EVID. 608(b); *Hammer*, 296 S.W.3d at 566 (explaining that Rule 608(b) is not inconsistent with the Constitution). The report reflects that these specific instances of conduct were reported by B.F.'s mother and were not observed by Dr. Pugliese himself. There is nothing in the bill of exception that indicates Dr. Pugliese's "diagnostic impression" had any bearing on B.F.'s credibility. Thus, we agree with the State that Williams has failed to show how B.F.'s psychological history affected her credibility in this case. *See Norrid*, 925 S.W.2d at 347.

ISSUE FOUR: PROBATION OFFICER

In his fourth issue, Williams argues the trial court abused its discretion by not allowing him to secure the attendance of B.F.'s probation officer who would have impeached B.F.'s

testimony. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Valadez v. State*, 663 S.W.3d 133, 143 (Tex. Crim. App. 2022).

The record reflects that the trial court reviewed B.F.'s juvenile records *in camera*. Outside the presence of the jury, the trial court informed the parties that the juvenile records showed the following: B.F. submitted to Dr. Pugliese's psychological evaluation on April 3, 2014, and on April 22, 2014, the trial court determined B.F. engaged in delinquent conduct and was in need of supervision. The trial court stated that the juvenile records reflected B.F. was required to report weekly to her probation officer. According to the trial court, the petition to adjudicate alleges that B.F. did not report to her probation officer on May 1, 2014, May 8, 2014, May 15, 2014, May 22, 2014, May 29, 2014, June 5, 2014, June 12, 2014, June 26, 2014, July 17, 2014, July 24, 2014, July 31, 2014, August 7, 2014, and August 14, 2014.

Defense counsel argued that these juvenile records showed that B.F. did report weekly on some dates during this period of time, which contradicted her testimony that she was with Williams continuously during the period of time in question. The trial court noted that the petition to adjudicate contained in the juvenile records did not state that she reported on the dates not mentioned. The trial court explained that (1) the State's attorney could have just picked dates to allege in the petition to adjudicate, and (2) the fact that some dates are not mentioned does not necessarily mean B.F. did report on those dates.

Later, on the last day of trial, Williams called B.F. to testify outside the presence of the jury so that he could make a bill of exception. B.F. testified that she was still living with her mother when she was placed on probation on April 22, 2014, and that she did report weekly. B.F. testified that she reported to probation for a short time and then she stopped reporting. She explained that at the time she stopped reporting to her probation officer, she was with Williams

and that she continued to be with Williams to the time she was "captured." When asked specifically whether she reported on June 19, 2014, and July 10, 2014, B.F. stated that she did not report on those dates.

Defense counsel then asked the trial court to disclose the name of B.F.'s probation officer and orally requested a continuance so that the probation officer could be subpoenaed. The trial court then asked B.F. to clarify her testimony. B.F. agreed she did not report at all in May 2014. She testified she did not remember reporting in June or July 2014. The trial court stated, "I think these records support that." Defense counsel argued he needed the probation officer's name to impeach B.F., to which the trial court responded, "And tell us what we already know, that she stopped showing up." The trial court explained, "I think you're impeaching on a collateral matter." Defense counsel responded, "Except that we know that she was living with her mother [on] the dates from the time of the arrest until at least the time that she stopped reporting, which is directly contradictory to what she said." The trial court then asked B.F., "[W]hen you first met up with [Williams] in December, up until when you were put on probation, did you spend time with [Williams] in the motels and engage in that conduct occasionally, although not every day." B.F. responded affirmatively saying that she was with Williams "every day except Sunday." Defense counsel argued that B.F. was lying about "every day" and that he needed the probation officer's testimony to contradict her. The trial court replied, "These records indicate she was gone for months when she was supposed to be reporting. That sounds like every day to me." Williams argued that the records indicated that she actually did report during that period. The trial court replied, "No, they don't show that."

On appeal, Williams argues that his constitutional right to compulsory process for obtaining witnesses to present during trial in order to present a complete defense was violated by

the trial court.[15] *See Washingon*, 388 U.S. at 18; *Gonzalez v. State*, 714 S.W.2d 19, 25 (Tex. App.—Houston [1st Dist.] 1985). He further argues his right to confrontation was violated. *See Washington*, 388 U.S. at 18. In response, the State argues that Williams waived this issue on appeal because he did not file a written motion for continuance. *See Anderson v. State*, 301 S.W.3d 276, 280-81 (Tex. Crim. App. 2009) (explaining that the right to compulsory process is forfeited if a defendant does not properly request a motion for continuance); *see also* TEX. CODE CRIM. PROC. art. 29.08 (requiring sworn motion for continuance); *id*. art. 29.13 (providing that mid-trial motion for continuance must be based on an unexpected occurrence that surprised the defense). In his reply brief, Williams clarifies that he is not arguing the trial court erred by not granting him a continuance. He states that his "complaint is that the trial court abused its discretion by not allowing [him] to secure the attendance of the probation officer because [the trial court] would not even disclose the officer's name and would not allow the issue to [be] presented through the officer's testimony." However, Williams has failed to show how testimony from the probation officer would impeach B.F.'s credibility. As noted by the trial court, the juvenile records reflect that the State's petition to adjudicate alleged that B.F. did not report on certain dates. They did not indicate the opposite—that B.F. reported on certain dates. Nor is there any indication that the juvenile records at issue reflected that B.F. was not staying with Williams at the time in question. On this record, we cannot find any abuse of discretion by the trial court.

### ISSUES FIVE TO EIGHT: MOTION FOR CONTINUANCE

In his fifth issue, Williams argues that the trial court abused its discretion in denying his third motion for continuance so that he could procure B.F.'s psychiatric records from Maryland and Washington D.C. In his sixth, seventh, and eighth issues, Williams argues that by denying

---

[15]Williams argues that his rights were violated under both the Texas and United States Constitutions but has not explained how his rights under the Texas Constitution would be greater than those under the United States Constitution. *See* TEX. R. APP. P. 38.1(i). Thus, we will analyze this issue under federal constitutional principles.

his motion for continuance so that he could subpoena these psychiatric records, his right to compulsory process, his right to present a complete defense, and his right of confrontation were violated. We review a trial court's ruling on a motion for continuance for an abuse of discretion. *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996). A trial court does not abuse its discretion unless the appellant can show he was actually prejudiced by the denial of his motion for continuance. *Id.*

The record reflects that on July 27, 2017, the trial court heard Williams's motion for production of B.F.'s psychiatric records from Maryland and Washington, D.C. The trial court agreed to sign an order for the psychiatric records to be delivered to the court for in camera inspection. Defense counsel noted that the psychiatric institutions explained to him that a court order would most likely not be sufficient and that in order to receive those records, he would probably need to take the court's order to a Maryland court to receive the Maryland records and to a court in Washington, D.C. The trial court responded that it understood the procedure but that all it could do was sign an order and defense counsel was required to complete the process.

On November 13, 2017, Williams filed his third motion for continuance, arguing that he needed additional time to procure B.F.'s medical records from Maryland and Washington, D.C. On November 17, 2017, ten days before trial began, the trial court heard Williams's motion for continuance. Defense counsel argued he needed additional time to obtain the psychiatric records because he needed to "get a court-ordered subpoena issued." The trial court responded that it had already taken up this matter "months ago." Defense counsel replied that he had suffered a fractured ankle in August 2017. Williams attached to his motion for continuance a doctor's note that stated defense counsel should be on "light duty until 9/15/17." The trial court denied Williams's motion for continuance, stating that it would issue any subpoena requested by

defense counsel but the trial date, which was a special setting, would remain November 27, 2017.

The record reflects that defense counsel had between September 15, 2017 (the last date of his "light duty"), and the date of the continuance hearing on November 17, 2017, to follow the procedures in Maryland and Washington D.C. to obtain B.F.'s psychiatric records. *See* Md. Cts. & Jud. Proc. Code § 9-302; D.C. Code § 23-1502. The record does not demonstrate that defense counsel followed the proper procedures in Maryland and Washington, D.C. We conclude that based on this record, the trial court could have reasonably found that defense counsel was not diligent in procuring subpoenas for the psychiatric records in question. *See* Tex. Code Crim. Proc. art. 29.06 (requiring motion for continuance filed by defendant to show diligence and prohibiting the motion to be used for delay); *id.* art. 29.07 (requiring subsequent motions for continuance to meet the same requirements as the first motion for continuance). Accordingly, we hold the trial court did not abuse its discretion in denying Williams's third motion for continuance and that Williams has not shown that his rights were violated.

**ISSUE TEN: ADMISSIBILITY OF EVIDENCE OF HOME INVASION DURING PUNISHMENT PHASE**

In his tenth issue, Williams argues that during the punishment phase, the trial court abused its discretion in admitting evidence of a home invasion because (1) the State did not show its relevancy by proving beyond a reasonable doubt he was involved in the home invasion, and (2) even if relevant, evidence of the home invasion was unduly prejudicial under Texas Rule of Evidence 403. "A trial court has broad discretion in determining the admissibility of evidence presented at the punishment phase of trial." *Trejo v. State*, 683 S.W.3d 815, 819 (Tex. App.—San Antonio 2023, no pet.) (quoting *Schultze v. State*, 177 S.W.3d 26, 40 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd)). "We will not disturb a trial court's determination regarding the

admissibility of relevant evidence unless an abuse of discretion has been shown." *Id*. (quoting *Schultze*, 177 S.W.3d at 40).

Evidence is relevant to sentencing if it is "helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Rodriguez v. State*, 203 S.W.3d 837, 842 (Tex. Crim. App. 2006). Texas Code of Criminal Procedure article 37.07, section 3(a)(1), allows evidence to be offered during the punishment phase "as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense," and "notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of any extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act." TEX. CODE CRIM. PROC. art. 37.07, § 3(a)(1); *see Haley v. State*, 173 S.W.3d 510, 514-15 (Tex. Crim. App. 2005). Thus, "for purposes of assessing punishment, . . . the prosecution may offer evidence of any extraneous crime or bad act that is shown, beyond a reasonable doubt, either to have been (1) an act committed by the defendant or (2) an act for which he could be held criminally responsible." *Haley*, 173 S.W.3d at 514. Article 37.07 does not place crimes and bad acts on "separate path[s] towards admissibility." *Haley*, 173 S.W.3d at 515. The "statutorily imposed burden of proof beyond a reasonable doubt does not require the offering party to necessarily prove that the act was a criminal act or that the defendant committed a crime." *Id*.

> Unlike the guilt-innocence phase, the question at punishment is not whether the defendant has committed a crime, but instead what sentence should be assessed. Whereas the guilt-innocence stage requires the jury to find the defendant guilty beyond a reasonable doubt of each element of the offense, the punishment phase

requires the jury only [to] find that these prior acts are attributable to the defendant beyond a reasonable doubt.

*Id.* (citations omitted). Thus, article 37.07 "require[s] the burden of proof to be applied to a defendant's involvement in the act itself, instead of the elements of a crime necessary for a finding of guilt." *Haley*, 173 S.W.3d at 515.

"The process of proffering evidence to prove an extraneous offense, even when not explicit, is referred to as a threshold inquiry." *Trejo v. State*, 683 S.W.3d 815, 820 (Tex. App.—San Antonio 2023, no pet.). Before the trial court may admit such evidence, it must determine from the State's proffer that it is "able to prove the commission of bad acts and extraneous crimes beyond a reasonable doubt." *Id*. That is, there must be evidence from which a rational jury could conclude the extraneous offense or bad act is "attributable to the defendant beyond a reasonable doubt." *Haley*, 173 S.W.3d at 515; *see Palomo v. State*, 352 S.W.3d 87, 92 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (explaining that the trial court makes the decision on the threshold issue of admissibility by considering whether under the State's proffer, a rational jury could make the finding beyond a reasonable doubt). "Whether an extraneous offense was established beyond a reasonable doubt, however, is a question of fact for the jury rather than a preliminary question of admissibility for the trial court." *Trejo*, 683 S.W.3d at 820 (quoting *Davis v. State*, 315 S.W.3d 908, 914 (Tex. App.—Houston [14th Dist.] 2010), *rev'd on other grounds*, 349 S.W.3d 517 (Tex. Crim. App. 2011)).

Here, Williams does not point to the State's proffer and argue that the trial court abused its discretion in relying on that proffer in determining evidence of the home invasion was admissible. Instead, Williams points to testimony from a witness who testified during the punishment phase, arguing that because this witness explained there was no arrest in the home invasion case, there must therefore be no evidence showing that Williams had committed the

home invasion beyond a reasonable doubt. However, "courts of appeals generally do not review the sufficiency of the evidence supporting an extraneous offense presented during punishment." *Palomo*, 352 S.W.3d at 94; *see also* 43A GEORGE E. DIX & JOHN M. SCHMOLESKY, TEX. PRACTICE SERIES: CRIMINAL PRACTICE AND PROCEDURE § 51.36 (3d ed. 2011) ("Generally, the courts of appeals have refused to conduct evidence review of juries' possible conclusions that the State proved [unadjudicated prior] offenses by the required proof of beyond a reasonable doubt."); *see also Trejo*, 683 S.W.3d at 821 (discussing the trial court's threshold inquiry and then explaining that it is "not the responsibility of the judge sua sponte to insure that the foundation evidence is offered; the objector must move to strike the evidence if at the close of the trial the offeror has failed to satisfy the condition"). "Rather, courts of appeals have construed such evidence-sufficiency challenges as challenges to the admission of the evidence under an abuse of discretion standard." *Palomo*, 352 S.W.3d at 94; *see also Malpica v. State*, 108 S.W.3d 374, 378-79 (Tex. App.—Tyler 2003, pet. ref'd) (explaining that the "only review possible of the sufficiency of the proof of an extraneous offense introduced at the punishment state is a review under an abuse of discretion standard of the trial judge's threshold ruling on admissibility"); *Thompson v. State*, 4 S.W.3d 884, 886 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd) ("[W]e do not review the sufficiency of the evidence of an extraneous offense to support the jury's assessment of punishment. We construe appellant's complaint as a challenge to the admission of the extraneous offense evidence.").

"One of the reasons for not reviewing the sufficiency of the evidence to support extraneous offenses raised during punishment is because there is no actual finding by the jury that the defendant committed the extraneous offense." *Palomo*, 352 S.W.3d at 95. "We cannot determine whether the jury found beyond a reasonable doubt that appellant was criminally

responsible for the extraneous offense; nor can we determine if any such finding even affected the jury's determination of punishment." *Id*. Thus, "we review the trial court's decision to admit the evidence for an abuse of discretion" by considering "the transcript of the threshold inquiry" to determine whether the trial court abused its discretion in ruling a rational jury could have found beyond a reasonable doubt that the home invasion was attributable to Williams. *Id*.; *see also Haley*, 173 S.W.3d at 515 (discussing standard of prior offense and/or bad act being "attributable to the defendant beyond a reasonable doubt").

During the punishment phase and outside the presence of the jury, the State informed the trial court that it intended to introduce evidence of "a shooting that occurred in the home of [B.F.] and [her mother, Belinda F.] on August 16th of 2015, a Sunday," which was the day before trial was to begin in this case. The witnesses would testify that the State "had arranged to buy bus tickets for [B.F.] and Belinda F[.] to travel from Killeen, Texas, to San Antonio, Texas . . . for that trial early Monday morning, the 17th." According to the State, B.F. and Belinda F. would testify to multiple occasions where Williams "or his father or his brother" "approached [B.F. and/or Belinda F.] or seemed to be following them at various places in Killeen and, at least on one occasion, [] attempted to get [Belinda F.] to persuade [B.F.] to sign an affidavit of nonprosecution or something for [Williams's] lawyer to make these charges go away," "which they refused to do."

The State further informed the trial court that the witnesses would testify that at about 10:30 a.m. on Sunday August 16, 2015, B.F. and Belinda F. were in their apartment. One of B.F.'s sisters had gone to McDonald's to get food for the family. The door was not locked. As B.F. and Belinda F. were sitting in the living room, a masked male intruder "burst into the room, shot [Belinda F.] four times." The man then "went up to [B.F.] [and] tried to shoot her." B.F.

grabbed the gun. She and the intruder struggled with the gun, and "the gun went off." B.F. "fell to the ground [and] pretended [] she was dead." B.F.'s brother-in-law entered the room from a back bedroom and was also shot in the chest by the intruder. The intruder then fled and "disappeared into the woods." The intruder did not say anything, did not demand anything, and did not try to take anything. "There was no other objective of going into that house except to harm those people." The police then arrived and documented the scene.

The State informed the trial court that there would also be testimony that the day after the shooting, which was a Monday, prosecutors were arriving for Williams's trial when they learned about the shooting and filed a motion for continuance. Williams was present for trial that day, Monday August 17, 2015. From preliminary police reports sent from Killeen, the prosecutors learned that B.F. and Belinda F. suspected Williams "had something to do with" the shooting. At the hearing on the motion for continuance, the State represented that the shooting had occurred, the victims had not died, and B.F. had not been shot but had pretended to be dead. The trial court granted the continuance. On the Wednesday after the shooting, Ryan Wright, a state prosecutor with the human trafficking division, traveled to Killeen and met with B.F. and Belinda F. at the battered women's shelter. According to the State, Wright would testify that B.F. and Belinda F. were "scared to death" and said they were "going to disappear" because they did not "want to get hurt" and had received "the message" being sent to them by the shooting.

The State further informed the trial court in its proffer that at the next trial setting in this case, Williams did not appear. Counsel for Kandy informed the State that after the court date on August 17, 2015, Williams "had fled from" the apartment he shared with her and that she had not seen him again. Williams's counsel objected to this proffered testimony, arguing that it was not relevant under Texas Rules of Evidence 401 and 402 and that it was unduly prejudicial under

Rule 403. The trial court ruled that it was admissible during punishment. Given this proffer of the State, we find no abuse of discretion by the trial court in determining that a rational jury could have found beyond a reasonable doubt that Williams was linked to the home invasion and thus the evidence was relevant. *See Palomo*, 352 S.W.3d at 95.

Williams also argues the trial court abused its discretion because evidence of the home invasion was inadmissible under Texas Rule of Evidence 403. While a "trial court has wide latitude in determining the admissibility of punishment-phase evidence, the evidence must still satisfy Rule 403 of the Texas Rules of Evidence." *Rodriguez v. State*, 546 S.W.3d 843, 863 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Rule 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. Under this rule, "it is presumed that the probative value of relevant evidence exceeds any danger of unfair prejudice." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009). It is therefore "the objecting party's burden to show that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice." *Tucker v. State*, 456 S.W.3d 194, 207 (Tex. App.—San Antonio 2014, pet. ref'd). Rule 403 "envisions exclusion of evidence only when there is a 'clear disparity between the degree of prejudice of the offered evidence and its probative value.'" *Hammer*, 296 S.W.3d at 568 (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)).

When a party objects under Rule 403, the trial court, in conducting a Rule 403 analysis, must balance

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the

> evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *see also Rodriguez*, 546 S.W.3d at 863. "The trial court is presumed to have conducted the proper balancing test if it overrules a [Rule] 403 objection, regardless of whether it conducted the test on the record." *Rodriguez*, 546 S.W.3d at 863.

Williams argues that the evidence was inadmissible under Rule 403 because there was no evidence linking him to the home invasion. However, as explained above, the trial court did not abuse its discretion in determining a reasonable jury could conclude that the home invasion was attributable to Williams, and this evidence, which linked Williams to a home invasion for the purpose of silencing fact witnesses in this case, was highly probative to Williams's punishment. Additionally, the record reflects that presentation of the evidence did not consume an inordinate amount of time or repeat evidence already admitted. Finally, Williams has made no showing as to the other relevant factors. We thus find no abuse of discretion by the trial court determining the evidence was admissible under Rule 403.

### ISSUE ELEVEN: VICTIM IMPACT EVIDENCE OF HOME INVASION DURING PUNISHMENT PHASE

In his eleventh issue, Williams complains that Belinda F. testified during the punishment phase as to how the home invasion affected her. When asked by the State to describe the injuries she suffered during the shooting, Belinda F. testified she was shot in her left arm, right arm, neck, and chest. Without being questioned or prompted by the State, Belinda F. continued to describe the impact the shooting had on her life: "I do have PTSD, anxiety, and severe depression. I go see my psychiatrist two weekends—every two weeks, I go see my psychiatrist, and I am on four different meds now, and I've never been on meds in my life." Defense counsel did not object to these statements made by Belinda F.

On appeal, Williams argues that this issue is preserved because he made his objections during the threshold inquiry and obtained a running objection. However, the objections made during the threshold inquiry were preserved as to the evidence discussed during the State's proffer. There was no discussion during the State's proffer as to any victim impact evidence being presented by the witnesses. Here, the witness volunteered the information. It was incumbent at that point for the defense to object to the testimony now being complained about on appeal. By failing to object when Belinda F. volunteered this information, Williams failed to preserve error on appeal. *See* TEX. R. EVID. 33.1.

### ISSUES TWELVE TO FIFTEEN AND SIXTEEN TO NINETEEN: ADMISSIBILITY OF EVIDENCE DURING GUILT/INNOCENCE PHASE

*A. Standard of Review*

A trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *Valadez v. State*, 663 S.W.3d 133, 143 (Tex. Crim. App. 2022); *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). There is no abuse of discretion if the trial court's ruling is within the zone of reasonable disagreement. *Valadez*, 663 S.W.3d at 143.

*B. Issue Twelve: Admissibility of Defendant's Exhibit 20*

In his twelfth issue, Williams complains that the trial court abused its discretion in ruling Defendant's Exhibit 20 was inadmissible. Defendant's Exhibit 20 is a document from the Case Analysis Division of the National Center for Missing and Exploited Children, which states that the search of B.F.'s phone number showed that on B.F.'s Facebook page, she indicated she was "in a relationship" with Kandy. Williams argues he should have been able to admit this exhibit to show that B.F. and Kandy were in a relationship together and thus B.F. had a reason to lie about Williams's involvement in this case. In response, the State points out that Defendant's Exhibit 20 is unauthenticated and that the record does not reflect that Williams attempted to authenticate the

document in his offer of proof either through a witness with personal knowledge or through a business records affidavit. In reviewing the record, we agree with the State and hold the trial court was within its discretion to exclude Defendant's Exhibit 20 for lack of authentication.

### C. Issue Thirteen: Admissibility of Defendant's Exhibit 22

In his thirteenth issue, Williams complains that his right of confrontation was violated when the trial court refused to admit Defendant's Exhibit 22, which is a police report from the Killeen Police Department dated November 24, 2010. However, statements made in police reports are generally not admissible in a criminal case. *See* TEX. R. EVID. 803(8)(A)(ii); *see also Fischer v. State*, 252 S.W.3d 375, 383 (Tex. Crim. App. 2008). Further, as pointed out by the State, even if the statements made in Defendant's Exhibit 22 were not inadmissible hearsay, Williams did not authenticate the police reports at issue. *See* TEX. R. EVID. 901, 902. Thus, the trial court did not abuse its discretion in determining Defendant's Exhibit 22 was inadmissible.

### D. Issues Fourteen and Fifteen: Admissibility of Defendant's Exhibit 19

In his fourteenth and fifteenth issues, Williams argues the trial court abused its discretion in excluding Defendant's Exhibit 19, which included hundreds of pages of messages B.F. sent from an application called "Tagged" to individuals not involved in Williams's case. According to Williams, this evidence was important to impeach B.F. because B.F. testified that she met Williams on an application called Tagged, and the hundreds of pages of Tagged messages contained in Defendant's Exhibit 19 did not show any conversations between B.F. and Williams. Thus, Williams argues Defendant's Exhibit 19 showed that B.F. lied about meeting him on Tagged. The trial court was skeptical of this evidence, noting that "the absence of evidence is not evidence of absence, especially when it comes to social media, [which] are notorious at keeping

records." The trial court ruled that the hundreds of conversations of B.F. with third parties were not admissible and would "add more confusion than they do clarity" to the jury.

Williams also argued this evidence showed that B.F. "was running a prostitution enterprise before she met [Williams] and continued afterwards." Williams argued to the trial court that the evidence showed B.F.'s pattern, scheme, and motive. The trial court ruled the evidence was inadmissible.

In its brief, the State emphasizes that Defendant's Exhibit 19 shows that the Tagged account was created in June 2014. The State also points out that B.F. testified she had multiple "Tagged" accounts because she often forgot the password to the account and so she would create a new account. Indeed, the record reflects that when asked about the "Lolita" Tagged account, B.F. testified she created it in June 2014. Defense counsel then asked why she had testified she met Williams through Tagged in 2013. B.F. replied, "I did meet [Williams] in Tagged through '13—'13. I had multiple pages that I had, and some I deleted, and some I recreated because I had forgotten passwords, so I had to make new ones." The State argues that in light of B.F.'s testimony that she had multiple "Tagged" accounts, the trial court did not abuse its discretion by excluding Defendant's Exhibit 19, which included voluminous hearsay statements that were created at least six months after B.F. met Williams. Further, the State points out that Williams argues Defendant's Exhibit 19 should have been admissible under Texas Rule of Evidence 404(b). According to the State, even if Defendant's Ex. 19 was admissible under Rule 404(b), the "Tagged" documents still contain hearsay and Williams did not direct the trial court to a hearsay exception that would apply nor did Williams follow the steps to admit the documents as extrinsic evidence of a prior inconsistent statement. *See* TEX. R. EVID. 803(1)-(24); 613(a). We

agree with the State that the trial court did not abuse its discretion in excluding Defendant's Exhibit 19 as inadmissible hearsay. *See* TEX. R. EVID. 802, 803.

### E.  Issues Seventeen to Nineteen: Admissibility of State's Exhibits 1 to 3A

Williams argues the trial court abused its discretion in overruling his Rules 401, 402, 403, hearsay, and authentication objections to State's Exhibits 1 to 3A. State's Exhibits 1 to 3A contain over 3,000 pages relating to ads posted on Backpage, including sexually explicit photos of B.F. and/or Kandy. Williams argues the ads were irrelevant and highly prejudicial because although the ads were linked to his name, email, phone number, and credit cards, "there was no evidence that he posted the ads." Williams further argues the Backpage ads contained inadmissible hearsay because "there was no link that these were posted by" him and thus no link connecting him to the contents of the ads. Williams further argues that the Backpage ads were not authenticated pursuant to Rule 901.

In response, the State points out that it authenticated State's Exhibits 1-3A by presenting a business records affidavit by the custodian of records of Backpage.com. *See* TEX. R. EVID. 902. It further emphasizes that circumstantial evidence shows Williams was responsible for posting the Backpage ads. Indeed, at trial, B.F. testified that Williams ran the prostitution enterprise, including taking the very pictures that appeared in the Backpage ads. After Williams's arrest, gift cards were found on his person and in his vehicle that were used to purchase Backpage ads. Further, Williams's name was connected to some of the ads. Thus, the evidence circumstantially shows that Williams was responsible for the content of the ads. The Backpage ads are thus relevant and were a statement made by a party opponent under Rule 801(e)(2)(A). *See* TEX. R. EVID. 801(e)(2)(A); *see Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012) ("The preliminary question for the trial court to decide is simply whether the proponent of the evidence

has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic."). Finally, to the extent the evidence shows Kandy posted any of the Backpage ads, evidence was presented at trial that she was part of a conspiracy and therefore her statements can be attributed to Williams. *See* TEX. R. EVID. 801(e)(2)(E) (providing that a co-conspirator's statement made during a course of a conspiracy is a statement by a party opponent). And, because the Backpage ads featured a minor child, the trial court did not abuse its discretion in concluding the statements within the Backpage ads were statements against a penal interest. *See* TEX. R. EVID. 803(24). For these reasons, we conclude the trial court did not abuse its discretion by concluding State's Exhibits 1-3A were authenticated, were relevant, and were not inadmissible hearsay.

Williams further argues State's Exhibits 1-3A were inadmissible pursuant to Texas Rule of Evidence 403. Rule 403 provides that relevant evidence should be excluded "if its probative value is *substantially outweighed* by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403 (emphasis added). "Evidence is unfairly prejudicial when it has 'an undue tendency to suggest that a decision be made on an improper basis." *Pawlak v. State*, 420 S.W.3d 807, 809 (Tex. Crim. App. 2013) (quoting *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1990)).

In support of this argument, Williams points to *Pawlak v. State*, 420 S.W.3d 807, 809 (Tex. Crim. App. 2013), where the court of criminal appeals considered whether the admission of extraneous offense evidence should have been excluded under Rule 403. In a sexual assault of a child case, the trial court allowed thousands of extraneous-offense pornographic images over appellant's objection under Rule 403. *Pawlak*, 420 S.W.3d at 808. The images related to a crime

for which the appellant was not on trial, possession of child pornography. *Id*. at 810. The State argued the images were probative to rebut appellant's allegations that he was not sexually interested in men or boys. *Id*. The court concluded that "while the extraneous-offense evidence may have been permissible rebuttal evidence, it did not show that an assault or attempt assault was more likely to have occurred." *Id*. Thus, the court found that "the extraneous-offense evidence was only marginally probative as a possible rebuttal of appellant's theory that he was not sexually interested in young men." *Id*. at 811. Further, the State's need for the evidence was not great as it had five complainants who all testified that the appellant had assaulted them. *Id*. Thus, because the images related to an extraneous offense, the evidence was only marginally probative, and the State's need of the evidence was not great, the court concluded the trial court abused its discretion in admitting the evidence over appellant's Rule 403 objection. *Id*.

The facts presented in this case, however, are distinguishable. The Backpage ads in this case relate directly to the underlying offense and they corroborate B.F.'s testimony. Thus, the State had great need of the evidence to prove its case against Williams. While the images were prejudicial, evidence of the underlying crime would necessarily be prejudicial. *See Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000) (explaining that "[a]ny evidence presented by the State is generally prejudicial to the defendant). However, Rule 403 "envisions exclusion of evidence only when there is a 'clear disparity between the degree of prejudice of the offered evidence and its probative value.'" *Hammer*, 296 S.W.3d at 568 (quoting *Conner*, 67 S.W.3d at 202). The court of criminal appeals has emphasized that exclusions of evidence under Rule 403 "should be used sparingly." *Id*. In light of the Backpage ads relating directly to the underlying defense and the State's need of the evidence to prove its case, we hold that the trial judge did not abuse his discretion in concluding that the danger of unfair prejudice did not substantially

outweigh the probative value of this evidence. Thus, we hold the trial court did not err in overruling Williams's objection pursuant to Rule 403.

### ISSUE SIXTEEN: LIMITING INSTRUCTION

In his sixteenth issue, Williams argued the trial court erred in giving an incorrect oral limiting instruction to the jury regarding the extraneous act of bail jumping. Texas Rule of Evidence 105 provides that "[i]f the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on request, must restrict the evidence to its proper scope and instruct the jury accordingly." TEX. R. EVID. 105(a). At trial during the guilt/innocence phase, the State began to elicit testimony about Williams failing to appear for trial and "jumping bail." Williams requested the trial court to give an extraneous offense limiting instruction. The trial court instructed the jury that it should only consider the evidence "for the limited purpose for which it is being admitted." The trial court continued,

> And let me clarify the purpose for which it's being limited. This type of evidence, this uncharged conduct, is permissible to prove such things as the defendant's motive, opportunity to commit the crime, his criminal intent—

Defense counsel then objected that the instruction was going beyond the limited purpose. The trial court noted that his language was "verbatim from Rule 404—preparation for the offense, planning, knowledge of the offense, identity of the person who committed the crime, absence of mistake." The trial court then stated, "You can consider it for one of those—one of those considerations if you believe it beyond a reasonable doubt." Defense counsel objected again and asked for a ruling. The trial court overruled his objection. However, later, the trial court in its charge to the jury restricted the jury to considering the bail jumping evidence only for consciousness of guilt:

You are instructed that if there is any testimony before you in this case regarding the defendant's flight from prosecution, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such act, and even then you may only consider the same in determining the consciousness of guilt of the defendant, if any, in connection with the offense, alleged against him in the indictment in this case, and for no other purpose.

You are further instructed that if there is any testimony before you in this case regarding the defendant's having committed acts of misconduct other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such acts of misconduct, if any were committed, and even then you may only consider the same in determining the intent, if any, of the defendant in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

On appeal, Williams argues this limiting instruction in the jury charge was not effective because it was not given at the time the evidence was admitted. According to Williams, from the time the evidence was admitted to the time of the jury charge, the jury was allowed to form a negative inference about him and consider the evidence for "any purpose." Thus, Williams contends the trial court asked the jury "to do the impossible," *Hammock v. State*, 46 S.W.3d 889, 894 (Tex. Crim. App. 2001), by first instructing the jury on Rule 404 verbatim and then properly limiting the jury to consider the evidence for only "consciousness of guilt" in the charge.

However, the trial court did not first instruct the jury that it could consider the bail jumping evidence for "any purpose." The trial court limited those purposes to the ones listed in Rule 404(b). Furthermore, the evidence of bail jumping in this case did not confuse the jury. The act of bail jumping lends itself to a common-sense interpretation—that Williams fled from authorities because he knew he was guilty and would likely be subjected to punishment. Thus, from this record, we cannot conclude there was a risk the jury formed a negative inference argued by Williams from the time the evidence was admitted to the time it was correctly instructed in the jury charge. Furthermore, the jury is presumed to have followed the proper

instruction in the jury charge. We thus conclude Williams has not shown he was harmed by the trial court's first limiting instruction under Rule 404(b).

**ISSUES TWENTY TO TWENTY-TWO: WARRANTLESS ARREST AND SEARCH**

In his twentieth, twenty-first, and twenty-second issues, Williams argued the trial court abused its discretion in denying his pretrial motion to suppress, which argued his warrantless arrest and warrantless search were unconstitutional. We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Weems v. State*, 493 S.W.3d 574, 577 (Tex. Crim. App. 2016). First, we "afford almost total deference to a trial [court]'s determination of historical facts." *Id*. The trial court is "the sole trier of fact and judge of witnesses' credibility and the weight to be given their testimony." *Id*. The trial court "is entitled to believe or disbelieve all or part of the witness's testimony—even if that testimony is uncontroverted—because [the trial court] has the opportunity to observe the witness's demeanor and appearance." *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). If the trial court "makes express findings of fact, we view the evidence in the light most favorable to [the court's] ruling and determine whether the evidence supports these factual findings." *Id*. Second, we review the trial court's "application of the law to the facts de novo." *Weems*, 493 S.W.3d at 577. We will sustain the trial court's ruling "if the record reasonably supports that ruling and is correct on any theory of law applicable to the case." *Id*.

Here, after hearing evidence at the pretrial motion to suppress hearing, the trial court made the following findings of fact:

1. On August 19, 2014, Williams was arrested as a result of a sting operation by the Texas Department of Public Safety Criminal Investigations Division (CID) and the Office of the Attorney General (OAG).
2. Agent Shawn Hallett of CID testified that he is part of an operation investigating human trafficking targeting juveniles.

3. On or about August 13, 2014[16], Agent Hallett saw an ad posted under the escort section of an online website called Backpage that appeared to be two women, including a younger female in one of the pictures.

4. Agent Hallett attempted to make contact with one of the women in the ad through the phone number provided and a "two-girl special" was agreed to.

5. The operation tracked the two women through the cell-phone "pings" beginning on August 18, 2014. The two women were tracked from Austin to Killeen.

6. On August 18, 2014, a rendezvous was set up between Agent Hallett, and one of the women, who identified herself as Kandy, after seeing a second ad on Backpage with the same woman.

7. Once inside the hotel, Kandy, also known as Deborah Cooper, was taken into custody by two other members of the operation: Sgt. John Elizarde and an unnamed deputy.

8. Ms. Cooper was not free to leave, but was not *Mirandized*.

9. Eventually, Ms. Cooper was *Mirandized* in the hotel lobby and asserted her rights.

10. The agents were then directed to Room 328 of the Sleep Inn, where they found the underage woman, Ms. [B.F.] Agent Hallett identified himself as State Police.

11. The members of the operation searched the room and secured three cell phones, did the inventory, seized the property on those cell phones, and took pictures.

12. No search warrant was obtained to search the room.

13. The officers entered the room to retrieve and recover a juvenile, specifically [B.F.].

14. The officers received a Directive to Apprehend from Juvenile Court of Bexar County, specifically [B.F.].

15. The officers received a similar Directive to Apprehend from Juvenile Court of Bell County, on or about August 18, 2014.

16. Agent Hallett obtained an arrest warrant, but not a search warrant, for [B.F.].

17. When Agent Hallett pushed the door open, his foot crossed the threshold without consent of the person in the room.

18. The arrest warrant was not a combination warrant.

19. A subpoena was requested and granted requesting the subscriber information from the ads on Backpage postings.

---

[16]The trial court held its pretrial motion to suppress hearing on May 20, 2015. However, the trial court's findings of fact erroneously refer to August 2015, and not August 2014. It is clear from the record that these are mere typographical errors and that the trial court's findings were related to August 2014 and not August 2015.

20. According to the response from Backpage, one of the purchasers of the ad, or subscriber of the ad, was Isaac Williams.

21. During the arrest and inventory, Williams pulled into the parking lot.

22. Agent Hallett, Agent Shannon Jones, Agent Mike Mingst, and Sgt. John Elizarde left the hotel room to make contact with Williams. Each officer or agent had a badge around their neck or around their belt.

23. Williams stepped out of his car, was patted down, and searched. A wallet containing fourteen credit and debit cards and his driver's license, a receipt, and pocket calendar, were found on him.

24. The detectives had reason to believe that Williams was engaged in criminal activity and he was arrested.

25. Inventory and subsequent seizure of items in the car was done in the parking lot before the car was towed, incident to Williams being arrested.

26. No search warrant was obtained to search Williams's wallet, take photographs of the hotel rooms or of Williams's vehicle.

27. Williams was read his *Miranda* warnings when he was arrested at the hotel parking lot, and he refused to speak with detectives.

28. While in jail custody, and without a reminder of his *Miranda* warnings, Williams was asked for the passcode to his phone.

29. At the Bexar County Jail, Ms. Cooper did not reinitiate any type of contact with law enforcement and was eventually asked for the passcode to her cell phone.

30. The trial court found that the testimony of the officers was credible.

In viewing the evidence at the suppression hearing in the light most favorable to the trial court's ruling, we conclude evidence supports the trial court's factual findings. *See Weems*, 493 S.W.3d at 577.

In its conclusions of law, the trial court noted that while a law enforcement officer should obtain a warrant prior to making an arrest, the officer may arrest an individual without a warrant if there is probable cause for the arrest. *See Lunde v. State*, 736 S.W.2d 665, 666 (Tex. Crim. App. 1987). The trial court further explained that probable cause exists where the facts and circumstances within the officer's knowledge and of which he has reasonable trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a person has committed or is committing an offense. *See Amores v. State*, 816 S.W.2d 407, 413

(Tex. Crim. App. 1991); *Lunde*, 736 S.W.2d at 667. The trial court further explained that in reviewing a warrantless arrest to determine the existence of probable cause, the court determines the facts known to the officer at the time of the arrest. *See Atkins v. State*, 919 S.W.2d 770, 774 (Tex. App.—Houston [14th Dist.] 1996, no pet). The trial court noted that at the time the officers placed Williams under arrest, "they had reliable information from a Backpage ad that two individuals, including one minor, were being trafficked." The trial court concluded that "probable cause existed in the instant case because the officers had trustworthy information sufficient to warrant a reasonable belief that the defendant had committed the offense of trafficking of persons under the age of 18 years." The trial court thus concluded that the officers developed probable cause that Williams had committed an offense and thus they had probable cause to arrest him without a warrant.

The trial court then explained that a search incident to an arrest is reasonable when an officer has reason to believe a vehicle contains evidence of the offense of arrest. The trial court further stated that police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. *See Arizona v. Gant*, 556 U.S. 332, 346, 351 (2009). Thus, the trial court concluded Williams's car could be searched without a warrant.

The trial court, however, ruled that the cell phone records of the phones found on Williams and in his car were not admissible, explaining that officers had failed to secure a search warrant to search the cell phone data.[17] The trial court also ruled any statements made by Williams, whether exculpatory or inculpatory, stemming from his custodial interrogation were

---

[17]This statement by the trial court was incorrect; the record reflects that search warrants were obtained to search the cell phones in question.

inadmissible. At trial, however, the State moved to introduce evidence of the contents of the cell phones. The defense objected, and the trial court overruled the objection.

On appeal, Williams points out that the Backpage ads themselves did not indicate Williams was trafficking anyone. He argues there was no testimony B.F. had ever provided trustworthy information in the past. According to Williams, the officers only had a "hunch," which does not amount to probable cause. *See Lunde*, 736 S.W.2d at 667 ("An investigating officer's hunch, suspicion or good faith perception are not sufficient, alone, to constitute probable cause for an arrest."). The State responds that the officers had more than a hunch. The State points to evidence that the officers were aware Williams was trafficking B.F. by using Backpage, explaining that Williams's name was used to buy some of the ads and that B.F. identified Williams when he drove up to the hotel.

The State further argues the record supports a conclusion that Williams committed the offense of human trafficking in the presence or view of the officers. Article 14.04 of the Texas Code of Criminal Procedure provides that "[w]here it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused." TEX. CODE CRIM. PROC. art. 14.04. Williams claims that article 14.04 does not apply because B.F. was not a credible person and Williams was not about to escape. However, this is not a case where officers arrested an individual based on an anonymous tip. The evidence shows that the officers diligently prepared for a sting, issued subpoenas, and apprehended and interviewed [B.F.] before encountering Williams driving in the hotel parking lot near where they had just discovered an underage girl in a hotel room with condoms and lubricant. They then viewed Williams, upon seeing police

officers, turn his vehicle around and attempt to flee from the scene. We conclude that the evidence showed officers had more than a "mere hunch" in this case; they had probable cause to conclude Williams had committed the offense of human trafficking, and they were permitted to arrest Williams without a warrant pursuant to article 14.04.

With regard to the search of his Cadillac, Williams argues that search incident to an arrest does not apply here. The Supreme Court has held that "in cases where there was probable cause to search a vehicle[,] 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not actually been obtained.'" *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam) (citing *United States v. Ross*, 456 U.S. 798, 809 (1982)). In *Arizona v. Gant*, 556 U.S. 332, 346-47 (2009), the Supreme Court explained that once a defendant is arrested and secured in a patrol car, the arresting officer cannot justify a vehicle search as a search incident to arrest. The Court, however, reaffirmed its holding in *Ross* that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity, . . . *Ross* . . . authorizes a search of any area of the vehicle in which the evidence might be found." *Gant*, 556 U.S. at 346-47. The Supreme Court held that "*Ross* allows searches for evidence relevant to the offenses other than the offense of arrest, and the scope of the search authorized is broader." *Gant*, 556 U.S. at 347. Thus, after *Gant*, an officer may search a vehicle incident to an arrest (1) when the arrestee is unsecured and the area of the vehicle is within his immediate control, or (2) "when it is reasonable to believe that evidence of the offense might be found in the vehicle." *Id*. at 335.

Williams argues that the "officers did not articulate that they had any reason to believe that they would find evidence of continuous human trafficking" and points out that there were no other individuals in the car. In response, the State emphasizes that the rule in *Gant* does not turn

on subjective articulation but rather on whether it was "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 335, 343 (citation omitted). The State contends it is reasonable to believe that after a person has been arrested for human trafficking, there might be tools of the trade in the car, such as phones and condoms. We agree with the State. After detaining B.F. in the hotel room and interviewing her, it was reasonable for the officers to believe that B.F. was communicating with Williams about the crime via cell phones. Thus, the officers had reason to believe the tools of the trade would be found in Williams's car.

Alternatively, we hold the search of Williams's vehicle is justified as a proper inventory search. We must sustain the trial court's ruling "if the record reasonably supports that ruling and is correct on any theory of law applicable to the case." *Weems*, 493 S.W.3d at 577. "Law enforcement officers may impound a vehicle and inventory its contents when 'the driver is removed from his automobile and placed under custodial arrest and no other alternatives are available other than impoundment to insure the protection of the vehicle.'" *Harris v. State*, 468 S.W.3d 248, 255 (Tex. App.—Texarkana 2015, no pet.) (quoting *Delgado v. State*, 718 S.W.2d 718, 721 (Tex. Crim. App. 1986)). To show that impoundment was reasonable, "[t]he police need not independently investigate possible alternatives to impoundment absent some objectively demonstrable evidence that alternatives did, in fact, exist." *Mayberry v. State*, 830 S.W.2d 176, 180 (Tex. App.—Dallas 1992, pet. ref'd). "Rather, 'Texas courts have generally found impoundment to be reasonable when the driver was alone when arrested or when passengers could not show they were licensed drivers.'" *Harris*, 468 S.W.3d at 256 (quoting *Yaws v. State*, 38 S.W.3d 720, 724 (Tex. App.—Texarkana 2001, pet. ref'd)). "Upon impounding a vehicle, law enforcement may secure the vehicle and inventory its contents." *Id.* (citing *South Dakota v.*

*Opperman*, 428 U.S. 364, 369 (1976)). "This inventory 'must be conducted in good faith and pursuant to reasonable standardized police procedure.'" *Id*. (quoting *Moskey v. State*, 333 S.W.3d 696, 700 (Tex. App.—Houston [1st Dist.] 2010, no pet.)). Here, Agent Hallett testified that he was required per policy to inventory Williams's car before impounding it. The evidence showed that Williams, B.F., and Kandy had all been taken into custody. Thus, the record supports the search of Williams's car as an inventory search.

Finally, Williams argues the trial court abused its discretion in admitting contents of his cell phone at trial over his objection because the contents of his cell phone were the fruit of the poisonous tree. Williams points to evidence that the officers obtained his passcode without reminding him of his rights under *Miranda*. In response, the State contends that Williams has not shown that the trial court erred in overruling his trial objections because Williams has not shown that the contents of the cell phones were inadmissible.

Here, the record shows that before any officer talked to Williams, the police had obtained search warrants to retrieve information from the cell phones found in Williams's car. Agent Hallett testified that after the search warrants for the phones were obtained, he went to talk to Williams at the jail. The conversation was not recorded, and Williams was not re-read his rights under *Miranda*. Agent Hallett asked Williams for his passcode to his phone. In response, Williams asked for an attorney. Agent Hallett called Williams's attorney, and Williams talked with his attorney on the phone. Williams then gave Agent Hallett the passcode.

The court of criminal appeals has explained that the "fruit of the poisonous tree" doctrine, as enunciated by *Wong Sun v. United States*, 371 U.S. 471 (1963), does not apply to mere violations of the prophylactic requirements in *Miranda*. *Baker v. State*, 956 S.W.2d 19, 22 (Tex. Crim. App. 1997); *see also Wells v. State*, 611 S.W.3d 396, 406 (Tex. Crim. App. 2020)

(rejecting appellant's premise "that a *Miranda* violation (a potential Fifth Amendment violation) can lead to the exclusion of evidence—other than the unwarned statements—under Article 38.23 or the Fourth Amendment" because "mere violations of the *Miranda* rule are not covered by the state exclusionary rule contained in Article 38.23") (quoting *Baker*, 956 S.W.2d at 24). Thus, "while the statement taken in violation of *Miranda* must be suppressed, other evidence subsequently obtained as a result of that statement (i.e. the "fruits" of the statement) need not be suppressed." *Baker*, 956 S.W.2d at 22 (citing *Oregon v. Elstad*, 470 U.S. 298, 314 (1985), and *Michigan v. Tucker*, 417 U.S. 433, 452 (1974)); *see also Wells*, 611 S.W.3d at 406 (explaining that "even though a statement taken in violation of *Miranda* must be suppressed at trial, other evidence subsequently obtained as a result of that statement (i.e., the 'fruits' of the statement) need not be suppressed") (quoting *Baker*, 956 S.W.2d at 22).

Both *Tucker* and *Elstad* involved a failure to give the required warnings rather than the failure to scrupulously honor warnings given. *See Elstad*, 470 U.S. at 300; *Tucker*, 417 U.S. at 435. The court of criminal appeals explained in *Baker*, 956 S.W.2d at 23, that the failure to adhere to the warnings that were provided, like the "mere noncompliance with *Miranda* does not result in a carryover taint beyond the statement itself." "The failure to scrupulously honor a suspect's invocation of his right to remain silent by continuing questioning is not necessarily coercive." *Baker*, 956 S.W.2d at 23. According to the court of criminal appeals, the "*Miranda* requirements embody an exclusionary rule or remedy rather than a substantive right or entitlement." *Id*. Thus, statements "taken in violation of *Miranda* are not obtained in violation of the law; they are simply statements that are subject to a judicially imposed prophylactic rule of exclusion[.]" *Id*. at 24. The court further explained that in the absence of actual coercion, the fruits of a statement taken in violation of *Miranda* need not be suppressed under the "fruits"

doctrine. *Baker*, 956 S.W.2d at 23. The court noted that the failure to scrupulously honor a suspect's invocation of his right to terminate a custodial interrogation by continuing questioning is not, by itself, coercive. *Baker*, 956 S.W.2d at 23. The court of criminal appeals held that the *Tucker/Elstad* rule applied to the failure to scrupulously honor the invocation of *Miranda* rights. *Baker*, 956 S.W.2d at 23. However, in the absence of actual coercion, the fruits of a statement taken in violation of *Miranda* need not be suppressed under *Wong Sun*'s "fruits" doctrine. *See Baker*, 956 S.W.2d at 23.

The record in this case does not show actual coercion by the police; thus, the fruit of the poisonous tree doctrine did not apply to the contents of the phones found in Williams's car. *See id*. at 22 ("The 'fruit of the poisonous tree' doctrine espoused in *Wong Sun* does not apply to mere violations of the prophylactic requirements in *Miranda*: while a statement taken in violation of Miranda must be suppressed, other evidence subsequently obtained as a result of that statement (i.e. the 'fruits' of the statement) need not be suppressed."). We hold the trial court did not err in admitting evidence of the contents of the cell phones at trial.

### ISSUE TWENTY-THREE: COMMENTS BY TRIAL COURT

In his final issue, Williams complains about various comments made by the trial court during the trial, which Williams argues shows the trial court's "partiality towards the prosecution and antagonistic view of [Williams] and his counsel." According to Williams, by making these comments, the trial court "improperly injected himself into the trial in front of the jury and commented on the weight of the evidence." Williams argues these comments made by the trial court during trial were structural error for which no harmless error analysis applies.

The United States Constitution guarantees a defendant the right to an impartial judge. *See Tumey v. Ohio*, 273 U.S. 510, 534 (1927). A violation of a defendant's right to an impartial judge

is structural error that is not subject to harm analysis. *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991). "The 'presence on the bench of a judge who is not impartial' deprives a defendant of his basic protections and infects the entire trial process from beginning to end." *Abdygapparova v. State*, 243 S.W.3d 191, 209 (Tex. App.—San Antonio 2007, pet. ref'd) (quoting *Fulminante*, 499 U.S. at 309-10). Thus, a defendant is entitled to a fair trial "before a judge with no actual bias against [him] or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 905 (1997). However, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). "In and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only *in the rarest circumstances* evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved." *Id.* (emphasis added). "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Id.* "They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* (emphasis in original).

"Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even . . . judges, sometimes display." *Id.* at 555-56. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556.

Here, Williams's challenge to the trial court is based solely on statements made to defense counsel during trial. Williams has not alleged that any bias arose from or was influenced

by an extrajudicial source. *See id*. at 554-55. Thus, Williams was required to show that the trial court's behavior "reveal[ed] such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id*. at 555. Williams has not met this burden.

For example, Williams complains that after B.F. testified she had "mixed feelings about how" she was feeling and defense counsel asked her to explain, the trial court told defense counsel to "just try to stick to the facts here. It's a very nebulous area you're covering." Williams further complains that during B.F.'s testimony, the trial court asked questions to clarify her testimony. Williams complains that when the State was marking an exhibit and asked the trial court if it wanted the State to write the exhibit number, the trial court responded, "On there, and it will make an appellate court, if they ever have to hear it, much more happy." Williams points to an exchange that occurred during the State's examination of Officer Hill where the State asked Officer Hill why the number "1" appeared before the area code of the phone number at issue, noting that it clearly appeared to be the country code. Defense counsel objected to evidence about why the number "1" would appear before the area code and phone number. The trial court asked defense counsel if he was still disputing the "1" being the country code. Defense counsel answered, "Your Honor, they're trying to backdoor this. The proper person to do that would be the custodian of records." The trial court responded, "Or somebody equipped with common sense." Williams further complains that after the defense's cross-examination of Officer Hill, the trial court excused the officer and stated, "I would run if I were you." We agree that many of the trial court's statements were unnecessary and showed impatience and even short-temperedness. However, the trial court's statements simply do not rise to the level of "reveal[ing] such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555; *see also id.* at 556 ("A judge's ordinary efforts at courtroom administration—even a stern

and short-tempered judge's ordinary efforts at courtroom administration—remain immune."). *Id*. at 556. Thus, we hold that the statements did not constitute structural error. Because the trial court's statements did not constitute structural error, it was incumbent on Williams to show how he was harmed by these statements made by the trial court. Williams failed to meet this burden.

## CONCLUSION

Having considered Williams's remaining issues, we find no reversible error by the trial court. Therefore, we affirm the judgment of the trial court.


Liza A. Rodriguez, Justice

Do Not Publish